ARNOLDO CASILLAS, ESQ., SBN 158519
DANIEL W. GILLETTE, ESQ., SBN 244019
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., Third Floor
Long Beach, CA 90807
Tel:  (562) 203-3030
Fax: (323) 297-2833
Email: acasillas@casillaslegal.com

Attorneys for Plaintiff DARRYELL FRAZIER

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYELL FRAZIER, | **CASE NO.:** |
| Plaintiff, | **COMPLAINT FOR DAMAGES** |
| vs. | **CIVIL RIGHTS VIOLATIONS PURSUANT TO 42 U.S.C. § 1983** |
| MARK RIDLEY-THOMAS; HILDA SOLIS; SHEILA KUEHL, LAW OFFICES OF THE LOS ANGELES COUNTY PUBLIC DEFENDER; COUNTY OF LOS ANGELES; RONALD BROWN; KELLY EMLING; LAURA GREEN, MICHAEL SUZUKI; JENNY BROWN; DANIEL KUPERBERG; RUBEN MARQUEZ; AND DOE DEFENDANTS 1 THROUGH 10, INCLUSIVE, | **1.  DELIBERATE INDIFFERENCE TO CONSTITUIONAL VIOLATIONS** |
| | **2. MUNICIPAL LIABILITY FOR CONSTITUIONAL VIOLATIONS** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

## COMPLAINT FOR DAMAGES

COMES NOW plaintiff DARRYELL FRAZIER, and alleges as follows:

# I.

## INTRODUCTION

1.      In 2005, Michael Judge, then the Public Defender for Los Angeles County, served as the Chair of a ten-member Working Group that was appointed by the State Bar Board of Governors in May 2004 and that was tasked with the revision of The State Bar of California Guidelines for the delivery of indigent defense services.  In 2006, Michael Judge's work resulted in revisions to the State Bar's guidelines for the provision of indigent legal defense services.  By that time, Darryell Frazier, in 2002, had become a client of the Los Angeles County Public Defender's Office as a detainee pending civil commitment.  Regretfully, the administrators of the Los Angeles County Public Defender's Office ignored these important guidelines that were intended to ensure that their clients' constitutional rights were protected.  As a result of this failure, Darryell Frazier has now spent more than 18 years in civil detention because the Public Defender's Office abandoned him and did not get his case to trial.  Because of this great delay and the institutional failures of the Public Defender's Office, the Superior Court had no choice but to conclude that Mr. Frazier's constitutional rights to a speedy trial had been violated.  Based on these findings, the court dismissed Mr. Frazier's case.

2.      The State Bar of California Guidelines for Indigent Defense Services Delivery System warn that excessive attorney workloads can compromise the ability of the public defender attorneys to render competent and quality representation in a timely manner.  The guidelines warn that number and type of cases for which an attorney is responsible may impact the quality of representation individual clients receive.   For that reason, the guidelines state that no attorney should be assigned more cases than he or she can effectively handle. The guidelines require that appropriate records should be kept by the administrators of the public defender offices to avoid assigning an excessive number of cases to an attorney.  Further, the guidelines state that the public defender administrators bear the ultimate

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

responsibility for assuring that workloads are not excessive in volume for any attorney to whom cases are assigned.   According to the guidelines, failure of a public defender administrator to effectively address the effects of workloads can result in personal civil liability and could put his or her license to practice law in jeopardy.

3.     The guidelines that Michael Judge and his working group developed state that should a public defender administrator determine that the current and incoming workload exceeds the capacity of the organization to provide necessary and competent representation, it is incumbent upon these administrators to secure the additional resources necessary or to decline to accept new cases to the extent that they exceed the capacity of the defense delivery system.

4.     Sadly, the guidelines that Michael Judge and the State Bar working group developed and implemented were ignored by the present defendants all to the great detriment of the present Plaintiff, Darryell Frazier and his constitutional rights. By 2006, the Public Defender's Office was so backlogged with work that the office declared itself unavailable to process any civil commitment cases and turned over the majority of their civil commitment cases to the superior court.  Despite the great workload, the administrators of the Public Defender's Office agreed in 2007 to be reinstated as counsel for these former clients.  This overwhelmed the office and civil commitment cases were again abandoned.

5.     Mr. Frazier's case is replete with examples of the attorneys from the Los Angeles County Public Defenders' Office beseeching their supervisors, the administrators of this office and the Los Angeles County Board of Supervisors, for help to ameliorate the great negative impact of the overwhelming workload.  These same attorneys warned the administrators and the Board of Supervisors repeatedly of the violations of the civil rights of the persons being represented by the PD's Office, including Mr. Darryell Frazier, and of the impending related civil liability related to the civil rights violations.   The letters and memoranda starkly stated that the

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    workload was so great that they were no longer "competent" to represent Mr. Frazier.

2    The attorneys handling Mr. Frazier's case simply could not get his case to trial

3    because of the customs and practices that were in place at the PD's Office and

4    because of the failures of their supervisors and administrators in addressing their case

5    load.  Despite this, the present administrator defendants and those defendants from

6    the Los Angeles County Board of Supervisors refused to take even modest measures

7    to protect Mr. Frazier's constitutional rights to due process and a speedy trial.  They

8    consciously allowed him to remain in civil detention for 18 years.

9                                            **II.**

10                             **SUMMARY OF CASE**

11          6.     Plaintiff Darryell Frazier (hereafter also "Mr. Frazier") has been held in

12   custody in a psychiatric hospital for more than 18 years awaiting trial.   The

13   extraordinary length of this delay resulted from a systemic breakdown in the Los

14   Angeles County public defender system.  This breakdown forced Mr. Frazier to

15   choose between having prepared counsel and a timely trial. Under the Constitution,

16   he had a right to both.  He got neither.

17          7.     After the office of the Office of the Public Defender was removed as his

18   attorney, the Los Angeles County Superior Court dismissed the civil detention action

19   against him finding that the 18-year pre-trial detention was so presumptively

20   prejudicial and oppressive that Mr. Frazier's due process rights were violated.

21          8.     The constitutional violations suffered by Mr. Frazier in being denied a

22   speedy trial and due process resulted from the deliberate indifference to his

23   constitutional rights by the present defendants who were all aware of his long

24   unconstitutional detention and acquiesced in the violation of Mr. Frazier's civil

25   rights.

26          9.     The purpose of the present action is to bring to light the complete failure

27   of the Public Defender's office and he County of Los Angeles to carry out their

28

4

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

statutory and ethical duties to their clients, and the failure of the individually named defendants to ensure that Mr. Frazier was receiving constitutionally adequate service.

10.    Further, in keeping with one of the goals of 42 U.S.C. Section 1983, the purpose of the of this action is also to make examples of the individual defendants so as to ensure that other similarly-situated public officials honor their promise to protect and defend the constitution of the United States.

### III.

### JURISDICTION AND VENUE

11.    This civil action is brought for the redress of alleged deprivations of constitutional rights as protected by 42 U.S.C. §§ 1983, 1988, and the Fourteenth Amendment of the United States Constitution.  Jurisdiction is founded on 28 U.S.C. §§ 1331, 1343, and 1367.

12.    Venue is proper in this Court under 28 U.S.C. § 1391(b), because Defendants reside in, and all incidents, events, and occurrences giving rise to this action occurred in the County of Los Angeles, California.

### IV.

### PARTIES

### Plaintiff

13.     At all times relevant hereto, Plaintiff Darryell Frazier (hereafter also "Mr. Frazier" and "Plaintiff") is and was a resident of the County of Los Angeles, California.

### Administrators and Managers of the Law Offices of the
### Los Angeles County Public Defender

14.    Defendant Ronald Brown:

a.    At all times relevant hereto defendant Ronald Brown was a resident of the County of Los Angeles.  Ronald Brown was appointed public defender of the County of Los Angeles in 2011 and served as the public

5

defender for Los Angeles County until 2016.  Prior to that, he served as Assistant Public Defender from 2006 to 2011. During that time, he also held supervisorial and administrative positions.  As the Public Defender, he was vested by law with the responsibility of representing indigent defendants in Los Angeles County at all stages of the criminal proceedings and in all stages of civil detention proceedings related to indigent persons detained pursuant to California *Welfare and Institutions Code*, section 6600, et seq.

b.      As early as 2006, when defendant Ronald Brown began serving as Assistant Public Defender, he was informed of the present plaintiff's pending SVP proceedings and he monitored Mr. Frazier's case until defendant Brown retired in 2016.  The present defendant did not appear as counsel for Plaintiff in the underlying proceedings or otherwise represent Plaintiff.  As such, liability against this defendant is not based on this defendant acting within the scope of legal representation of Mr. Frazier. Liability against this defendant is based on this defendant's role as administrator of the Law Offices of the Los Angeles County Public Defender (hereafter also "PD's Office") and its SVP unit, as well as this defendant's acquiescence in, and ratification of, unconstitutional customs and practices which resulted in the present plaintiff's harm and damages as alleged herein.

c.      With respect to all conduct alleged herein, defendant Ronald Brown acted under the color of law and in the course and scope of his employment with the County of Los Angeles.  During all said time, he was also a high-ranking administrator and policy maker for the for the PD's Office.

6

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

d.   At all times relevant hereto and as the Public Defender for Los Angeles County, and before that as Assistant Public Defender, defendant Ronald Brown was an administrator and supervisor with the authority to:

    i.   develop, adopt, ratify, implement, modify, abolish, revoke and rescind all customs, practices, procedures and policies of the Law Offices of the Los Angeles County Public Defender;

    ii.   develop and implement specific training programs for public defender personnel, including deputy public defenders,

    iii.   secure budget allocations for the funding for specific units, personnel needs and cases within his office;

    iv.   declare in any case being handled by his office that the public defender's office is "unavailable" and thereby have a court assign the case to another public defender agency (Los Angeles County Alternate Public Defender) or to a private panel attorney for handling;

    v.   declare conflicts of interest; and,

    vi.   order or otherwise undertake all necessary measures to ensure that any case handled by the public defender's office would be brought to trial in a timely manner.

e.   Defendant Ronald Brown monitored the civil detention proceedings of Mr. Frazier between 2006 and 2016.  Defendant Brown had specific knowledge Mr. Frazier's civil detention proceedings and, as spelled out herein below, was deliberately indifferent to his prolonged unconstitutional detention and the resulting violation of Mr. Frazier's civil rights.

f.   Defendant Brown is sued in his personal capacity as supervisor and administrator for his own culpable action or inaction with respect to the

7

present plaintiff, and in the administration of the PD's Office and its SVP unit and in the training, supervision and/or control of his subordinates.  He is also sued in his personal capacity for his acquiescence and ratification under color of law in the constitutional deprivations which this complaint alleges and for the conduct that showed a reckless or callous indifference to the rights of the present plaintiff.  Defendant Brown's affirmative conduct, as described herein below, also involves his acquiescence to, and ratification of, specific customs, practices and policies and procedures carried out by his subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

15.   Defendant Kelly Emling:

a.   At all times relevant hereto defendant Kelly Emling was a resident of the County of Los Angeles, and, as relevant here, served as an administrator within The Law Offices of the Los Angeles County Public Defender. She had the responsibility of supervising and administering the representation of indigent defendants in all stages of civil detention proceedings related to persons detained pursuant to California *Welfare and Institutions Code*, section 6600, et seq., including SVP detainees awaiting trial. With respect to all conduct alleged herein, defendant Emling acted under the color of law and in the course and scope of her employment with the County of Los Angeles as an administrator of the SVP Unit.  As an administrator within the PD's office, defendant Emling was also an administrator and supervisor with the authority to develop, adopt, ratify, implement, modify, abolish, revoke and rescind all customs, practices, procedures and policies of the Law Offices of the Los Angeles County Public Defender;

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

b.   Defendant Emling did not appear as counsel for Plaintiff in the underlying proceedings or otherwise represent Plaintiff.  As such, liability against this defendant is not based on this defendant acting within the scope of legal representation of Mr. Frazier. Liability against this defendant is based on this defendant's role as administrator of the PD's office and the SVP unit, as well as this defendant's acquiescence in, and ratification of, unconstitutional customs and practices which resulted in the present plaintiff's harm and damages as alleged herein.

c.   Defendant Emling is sued in her personal capacity as supervisor and administrator for her own culpable action or inaction with respect to the present plaintiff, and in the administration and supervision of the SVP Unit and in the training, supervision and/or control of her subordinates as well as for her indifference as well as for her indifference to the constitutional violations which resulted from her supervision of and administration of the SVP Unit.  She is also sued in her personal capacity for her acquiescence in, and ratification of, the constitutional deprivations which this complaint alleges and for the conduct carried out by her that showed a reckless or callous indifference to the rights of the present plaintiff.  This defendant's affirmative conduct, as described herein below, involves her acquiescence to, and ratification of, specific customs, practices and policies and procedures carried out by her subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

16.   Defendant Michael Suzuki:

a.   At all times relevant hereto defendant Michael Suzuki was a resident of the County of Los Angeles, and, as relevant here, served as administrator within The Law Offices of the Los Angeles County Public Defender.  He

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

had the responsibility of administering and supervising the representation of indigent defendants in all stages of civil detention proceedings related to persons detained pursuant to California Welfare and Institutions Code, section 6600, et seq., including SVP detainees awaiting trial.  With respect to all conduct arising from his work as an administrator and supervisor of the SVP Unit, defendant Suzuki acted under the color of law and in the course and scope of his employment with the County of Los Angeles.

b. As a Division Chief and/or as a supervisor in the PD's Office and its SUV unit, defendant Suzuki was also an administrator with the authority to develop, adopt, ratify, implement, modify, abolish, revoke and rescind all customs, practices, procedures and policies of the Law Offices of the Los Angeles County Public Defender's SVP Unit.

c. Liability against defendant Suzuki is based only on this defendant's role as administrator of the PD's office and the SVP unit, but also this defendant's acquiescence in, and ratification of, unconstitutional customs and practices which resulted in the present plaintiff's harm and damages as alleged herein.

d. After his promotion to supervisor/administrator within the PD's Office, Mr. Suzuki monitored the SVP Unit's civil detention proceedings, including those of Mr. Frazier.  As a result, defendant Suzuki had specific knowledge regarding the civil detention proceedings for Mr. Frazier and, as spelled out herein below, was deliberately indifferent to the violation of Mr. Frazier's civil rights which resulted from his long and unconstitutional detention.

e. Defendant Suzuki is sued in his personal capacity as supervisor and administrator for his own culpable action or inaction with respect to the

10

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

present plaintiff, and in the training, supervision and/or control of his subordinates as well as for his indifference to the constitutional violations which resulted from his supervision of and administration of the SVP Unit. He is also sued in his personal capacity for his acquiescence in, and ratification of, the constitutional deprivations which this complaint alleges and for the conduct carried out by him that showed a reckless or callous indifference to this Plaintiff's rights. This defendant's affirmative conduct, as described herein below, involves his acquiescence to, and ratification of, specific customs, practices and policies and procedures carried out by his subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present.

17.  Defendant Jenny Brown:

a.   At all times relevant hereto defendant Jenny Brown was a resident of the County of Los Angeles, and, as relevant here, served as administrator within The Law Offices of the Los Angeles County Public Defender. She had the responsibility of administering and supervising the representation of indigent defendants in all stages of civil detention proceedings related to persons detained pursuant to California Welfare and Institutions Code, section 6600, et seq., including SVP detainees awaiting trial. With respect to all conduct arising from her work as an administrator and supervisor of the SVP Unit, defendant Jenny Brown acted under the color of law and in the course and scope of her employment with the County of Los Angeles.

b.   As a Division Chief and/or as a supervisor in the PD's SUV unit, defendant Jenny Brown was also an administrator with the authority to develop, adopt, ratify, implement, modify, abolish, revoke and rescind

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    all customs, practices, procedures and policies of the Law Offices of the

2    Los Angeles County Public Defender's SVP Unit.

3    c.    Defendant Jenny Brown did not appear as counsel for Plaintiff in the

4    underlying proceedings or otherwise represent Plaintiff.  As such,

5    liability against this defendant is not based on this defendant acting

6    within the scope of legal representation of Mr. Frazier. Liability against

7    this defendant is based on this defendant's role as administrator of the

8    PD's office and the SVP unit, as well as this defendant's acquiescence

9    in, and ratification of, unconstitutional customs and practices which

10   resulted in the present plaintiff's harm and damages as alleged herein.

11   d.    After her promotion to supervisor/administrator, defendant Jenny Brown

12   monitored the SVP Unit's civil detention proceedings, including those of

13   Mr. Frazier.  As a result, defendant Jenny Brown had specific knowledge

14   regarding the civil detention proceedings of Mr. Frazier and, as spelled

15   out herein below, was deliberately indifferent to the violation of Mr.

16   Frazier's civil rights which resulted from his long and unconstitutional

17   detention.

18   e.    Defendant Jenny Brown is sued in her personal capacity as a supervisor

19   and administrator for her own culpable action or inaction with respect to

20   the present plaintiff, and in the training, supervision and/or control of her

21   subordinates as well as for her indifference to the constitutional

22   violations which resulted from her supervision of and administration of

23   the SVP Unit.  She is also sued in her personal capacity for his

24   acquiescence in, and ratification of, the constitutional deprivations which

25   this complaint alleges and for the conduct carried out by her that showed

26   a reckless or callous indifference to the violation of constitutional rights

27   of the present plaintiff.  This defendant's affirmative conduct, as

28

described herein below, involves her acquiescence to, and ratification of, specific customs, practices and policies and procedures carried out by his subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

18.   Defendant Daniel Kuperberg:

a.   At all times relevant hereto defendant Daniel Kuperberg was a resident of the County of Los Angeles, and, as relevant here, served as administrator within The Law Offices of the Los Angeles County Public Defender.  He had the responsibility of administering and supervising the representation of indigent defendants in all stages of civil detention proceedings related to persons detained pursuant to California Welfare and Institutions Code, section 6600, et seq., including SVP detainees awaiting trial.  With respect to all conduct arising from his work as an administrator and supervisor of the SVP Unit, defendant Kuperberg acted under the color of law and in the course and scope of his employment with the County of Los Angeles.

b.   As a Division Chief and/or as a supervisor in the PD's SUV unit, defendant Kuperberg was also an administrator with the authority to develop, adopt, ratify, implement, modify, abolish, revoke and rescind all customs, practices, procedures and policies of the Law Offices of the Los Angeles County Public Defender's SVP Unit.

c.   Defendant Kuperberg did not appear as counsel for Plaintiff in the underlying proceedings or otherwise represent Plaintiff.  As such, liability against this defendant is not based on this defendant acting within the scope of legal representation of Mr. Frazier. Liability against this defendant is based on this defendant's role as administrator of the PD's office and the SVP unit, as well as this defendant's ratification of,

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

and acquiescence in, and ratification of, the unconstitutional customs and practices which resulted in the present plaintiff's harm and damages as alleged herein.

d.   After his promotion to supervisor/administrator, defendant Kuperberg monitored the SVP Unit's civil detention proceedings, including those of Darryell Frazier.  As a result, defendant Kuperberg had specific knowledge regarding the civil detention proceedings for plaintiff Darryell Frazier and, as spelled out herein below, was deliberately indifferent to the violation of Mr. Frazier's civil rights which resulted from his long and unconstitutional detention.

e.   Defendant Kuperberg is sued in his personal capacity as supervisor and administrator for his own culpable action or inaction with respect to the present plaintiff, and in the training, supervision and/or control of his subordinates as well as for his indifference to the constitutional violations which resulted from his supervision of and administration of the SVP Unit.  He is also sued in his personal capacity for his acquiescence in, and ratification of, the constitutional deprivations which this complaint alleges and for the conduct carried out by him that showed a reckless or callous indifference to the rights of the present plaintiff.  This defendant's affirmative conduct, as described herein below, involves his acquiescence to, and ratification of, specific customs, practices and policies and procedures carried out by his subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

19.   Defendant Ruben Marquez:

a.   At all times relevant hereto defendant Ruben Marquez was a resident of the County of Los Angeles, and, as relevant here, served as administrator

14

within The Law Offices of the Los Angeles County Public Defender.  He had the responsibility of administering and supervising the representation of indigent defendants in all stages of civil detention proceedings related to persons detained pursuant to California Welfare and Institutions Code, section 6600, et seq., including SVP detainees awaiting trial.  With respect to all conduct arising from his work as an administrator and supervisor of the SVP Unit, defendant Marquez acted under the color of law and in the course and scope of his employment with the County of Los Angeles.

b.   As a Division Chief and/or as a supervisor in the PD's SUV unit, defendant Marquez was also an administrator with the authority to develop, adopt, ratify, implement, modify, abolish, revoke and rescind all customs, practices, procedures and policies of the Law Offices of the Los Angeles County Public Defender's SVP Unit.

c.   Defendant Marquez did not appear as counsel for Plaintiff in the underlying proceedings or otherwise represent Plaintiff.  As such, liability against this defendant is not based on this defendant acting within the scope of legal representation of Mr. Frazier.  Liability against this defendant is based on this defendant's role as administrator of the PD's office and the SVP unit, as well as this defendant's acquiescence in, and ratification of, unconstitutional customs and practices which resulted in the present plaintiff's harm and damages as alleged herein.

d.   After his promotion to supervisor/administrator, defendant Marquez monitored the SVP Unit's civil detention proceedings, including those of Darryell Frazier.  As a result, defendant Marquez had specific knowledge regarding the civil detention proceedings for plaintiff Darryell Frazier and, as spelled out herein below, was deliberately

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   indifferent to the violation of Mr. Frazier's civil rights which resulted
2   from his long and unconstitutional detention.

3      e.   Defendant Marquez is sued in his personal capacity as a supervisor and
4   administrator for his own culpable action or inaction with respect to the
5   present plaintiff, and in the training, supervision and/or control of his
6   subordinates as well as for his indifference to the constitutional
7   violations which resulted from his supervision of and administration of
8   the SVP Unit.  He is also sued in his personal capacity for his
9   acquiescence in, and ratification of, the constitutional deprivations which
10  this complaint alleges and for the conduct carried out by him that
11  showed a reckless or callous indifference to the rights of the present
12  plaintiff.  This defendant's affirmative conduct, as described herein
13  below, involves his acquiescence to, and ratification of, specific
14  customs, practices and policies and procedures carried out by his
15  subordinates which this defendant knew, or should have known, would
16  inflict a constitutional violation upon the present plaintiff.

17  ////
18  ////
19  ////
20  ////
21  ////
22  ////

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

**Board of Supervisor Defendants**

20.     Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl (hereafter also "BOS Defendants") were members of the Los Angeles County Board of Supervisors from 2014 up to and beyond December 22, 2020.  As presented below, and per the Los Angeles County Charter and these defendants' personal custom and practice, each one of these defendants were responsible for the management, supervision and administration of the Law Offices of the Los Angeles Public Defender.  During their individual tenure, each of the BOS Defendants learned of Mr. Frazier's SVP case, of his prolonged detention, and - through letters and memoranda from individual deputy public defenders at the SVP Unit - of the inability and failure of the PD's Office to timely bring Mr. Frazier's case to trial.  Despite repeated entreaties and warnings from the attorney staff of the PD's office, the BOS Defendants failed to take any action to address the violation of Mr. Frazier's rights to due process and a speedy trial.  The BOS Defendants each knew, as early as September of 2014, that Mr. Frazier would be held indefinitely in civil detention without trial unless they took action on his behalf.  Despite having the authority to do so, they refused to address the ongoing violation of his constitutional rights. The letters and memoranda they each received from the deputy public defenders in the SVP unit informed these defendants that the attorneys were unable to process Mr. Frazier's case and the attorneys also warned these defendants of the civil liability that would result should these defendants not act to correct the failures in the handling of Mr. Frazier's case.  Despite this knowledge, each of the BOS Defendants refused to take any action to ensure that Mr. Frazier's case was brought to trial in a timely fashion.  As a result, his constitutional rights to due process and a speedy trial were violated as spelled out herein.

///

///

17

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

21.     Defendant Mark Ridley-Thomas

a.      At all times relevant hereto defendant Mark Ridley-Thomas was a resident of the County of Los Angeles.  He is and has been a member of the Board of Supervisors of Los Angeles County since 2008.  As part of his duties as a member of the Los Angeles County Board of Supervisors, he was assigned with the administrative responsibility of directly overseeing, managing, directing and/or controlling defendant Law Offices of the Los Angeles County Public Defender.  With respect to his oversight, management and supervision of the Law Offices of the Los Angeles County Public Defender, Mark Ridley-Thomas did not have to seek authorization from the Board of Supervisors for his decisions, none of such decisions were required to be put before the Board of Supervisors for approval in the form of resolutions, policy determinations or other legislative acts.   The acts and omissions of Mark Ridley-Thomas alleged herein were made on a case-by-case basis.

b.      With respect to all conduct alleged herein, defendant Ridley-Thomas acted under the color of law.

c.      Per his responsibilities to manage, supervise and administer the Law Offices of the Los Angeles County Public Defender and its SVP Unit, Defendant Mark Ridley-Thomas had the authority to:

        i.   instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to declare that the public defender's office is "unavailable" and thereby have a case assigned to The Alternate Public Defender of Los Angeles County or to a private panel attorney;

///

///

---

18

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

ii.   develop and implement specific training programs for all personnel in the Law Offices of the Los Angeles County Public Defender, including deputy public defenders,

iii.   instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to replace or reassign personnel within the Law Offices of the Los Angeles County Public Defender; and,

iv.   instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to order subordinate personnel, to take specific actions in particular cases.

d.   Defendant Mark Ridley-Thomas oversaw, monitored and/or managed defendant The Law Offices of the Los Angeles County Public Defender. In carrying out his oversight of said office, he met monthly, and often more regularly, with defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to discuss and carry out the operation and management of The Law Offices of the Los Angeles County Public Defender.  At all relevant times hereto, Defendant Mark Ridley-Thomas had the authority to order or otherwise compel defendant The Office of the Public Defender and defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to "declare unavailability" in specific SVP cases.  The PD's office often declared "unavailability" in non-SVP cases with the consent of Mark Ridley-Thomas.

e.   These regular meetings included discussions of the SVP Unit, its case load, individual cases handled by said unit - including Mr. Frazier's

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

case, the backlog of work in the unit, the understaffing of that unit, and the extended time periods that SVP Unit clients were being detained.

f.   Defendant Mark Ridley-Thomas requested and received regular memoranda, emails, reports, budget requests, and other written correspondence and documents from defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez and other members of the Public Defender's Office regarding the management and operation of the SVP Unit, including the status of Mr. Frazier's civil detention proceedings. Defendant Ridley-Thomas had specific knowledge regarding Plaintiff's civil detention proceedings and, as spelled out herein below, was deliberately indifferent to the violation of Mr. Frazier's civil rights.   Defendant Mark Ridley-Thomas was aware of the present plaintiff's SVP case, the long delay in getting his case to trial, and the unconstitutional customs and practices which caused the delays in getting Plaintiff's case to trial.

g.   Defendant Mark Ridley-Thomas is sued in his personal capacity as a supervisor and administrator for his own culpable action or inaction related to the management of Mr. Frazier's case, and for his specific conduct and deliberate indifference which resulted in the violation of the present Plaintiff's constitutional rights.  He is also sued in his personal capacity for his acquiescence in, and ratification of, the constitutional deprivations which this complaint alleges and for his conduct which showed a reckless or callous indifference to the rights of the present plaintiff.  This defendant's affirmative conduct, as described herein below, involves his acquiescence to, and ratification of specific conduct carried out by his subordinates which this defendant knew, or should

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   have known, would inflict a constitutional violation upon the present
2   plaintiff.
3   h.   With respect to the individual cases handled by the PD's office,
4        defendant Mark Ridley-Thomas often managed individual cases that
5        were being handled by the PD's Office.  In his role as a supervisor and
6        administrator of the Office of the Public Defender, he was allowed to,
7        and did, deal with individual cases that were assigned to the PD's office.
8        This defendant would either request that the client's file be brought to
9        his office or inquire directly with Ronald Brown, or other supervisors in
10       the PD's Office as to individual cases. He would instruct the Ronald
11       Brown and his subordinates as to the management of the case, push for a
12       particular outcome, and demand that the particular case be resolved in a
13       particular way.   It was not uncommon, in fact, for employees of the
14       Chief Executive Office to bring public defender files to the office of
15       Mark Ridley Thomas at his request.  This included delivery of files by
16       the County Executive Officer, William T. Fujioka, to this defendant's
17       office.
18   i.   From 2006 on, this defendant learned of Mr. Frazier's case during the
19        various monthly meetings with Ronald Brown and the other
20        administrators and supervisors of the PD's office. In the discussion of
21        the operations of the SVP Unit, individual cases were presented to this
22        defendant. This defendant learned that Mr. Frazier was being medicated
23        against his will on a daily basis.  This distinguished Mr. Frazier's case
24        from the other SVP cases, as he was the only SVP client that was subject
25        to a forced medication court order and this put defendant Ridley-Thomas
26        on notice of Mr. Frazier's individual case.

21
**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

j.  In 2006, this defendant learned that the PD's Office could not bring SVP cases to trial because the volume of cases had overwhelmed the SVP staff and they could not process the cases to trial in a reasonable time and that as a result, a significant backlog of cases had arisen.   This defendant was informed by Ronald Brown and the PD's managers and administrators that there existed in 2006 a large backlog of cases and that the superior court as well as the District Attorney's Office became concerned that the SVP cases were not being processed.  New legislation came into effect which required that unadjudicated pending SVP cases be brought to trial within 24 months. At that point, this defendant, Ronald Brown and the PD's managers and administrators agreed that it was best to declare themselves "unavailable" and to request that the court appoint private counsel for Mr. Frazier and other SVP clients. Defendant Ridley-Thomas knew in 2006 that if private counsel was not appointed for Mr. Frazier, his case would linger indefinitely in the PD's office without going to trial because the PD's Office was overwhelmed with cases much older than Mr. Frazier's case and new legislation required that those earlier cases be promptly tried.  This created a conflict of interest within the PD's Office; i.e., they were forced to decide which SVP client would get priority over other SVP clients and have their case brought to trial.   Recognizing this conflict of interest, this defendant, Ronald Brown and the PD's managers and administrators agreed that they would declare the PD's Office unavailable as to these cases and have the court appoint private counsel.

k.  In 2007, it became apparent to defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office that this plan would not be successful.  The court informed them that there was

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

not an adequate amount of willing and qualified private attorneys to assume the management of the SVP cases.  As such, those cases which were to be transferred out of the SVP unit to private counsel to relieve the workload would remain in the SVP unit.  As such, this defendant knew that the overworked attorneys and staff in the SVP unit would continue to be overwhelmed with the high volume of cases and that the long expected delays in the bringing of the cases to trial would persist, including the delay in the processing of Mr. Frazier's case.

l.    In 2007, through the implementation of a memorandum of understanding between the PD's Office, the Superior Court and the Office of the District attorney it was agreed that these cases would remain in the SVP Unit. By the SVP cases remaining in the PD's office, it was expected by PD's Office, the Superior Court and the District Attorney's Office that Mr. Frazier and the other SVP clients would have competent counsel going forward.   To guarantee that competent counsel was provided to Mr. Frazier and the other SVP clients, the County of Los Angeles agreed to provide the PD's Office additional resources to increase the attorney and staff levels so as to "ensure that these SVP clients would have competent representation and that they would not be deprived of due process because of lack of County, attorney and judicial resources".  The County of Los Angeles provided the additional resources to the PD's Office in 2008. Defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office, however, did not apply these resources to the SVP unit.  Nothing changed in the SVP Unit, accordingly.  Defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office knew if they did not apply the additional resources to the SVP Unit, that overwhelming

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    workload would persist within the unit, and that the SVP clients,

2    including Mr. Frazier, would continue to be denied their due process

3    rights and their speedy trial rights.  Despite this, Defendant Ridley-

4    Thomas allowed the resources to be used for other purposes by the PD's

5    Office and allowed the overwhelmed environment to persist in the SVP

6    Unit.   The above agreements and history are memorialized, in part, in

7    the Memorandum of Understanding which is attached hereto as Exhibit

8    1.[1]

9    m.    Beginning in 2006, and throughout the eight following years, defendant

10          Ridley-Thomas, Ronald Brown and the PD's managers and

11          administrators continued to meet every month to discuss the

12          management of the PD's Office.  During many of these meetings, they

13          discussed Mr. Frazier's case.   Defendant Ridley-Thomas, Ronald

14          Brown and the other managers and administrators of the PD's Office

15          recognized at each meeting that the SVP Unit was overwhelmed with

16          work and that the delays in cases getting to trial were continuing to grow

17          every year.  They accepted that the SVP clients would not be getting a

18          speedy trial.  They agreed that because of the unsavory allegations

19          against these clients, that there would be little negative consequences to

20          them if the SVP cases were delayed.  In discussing Mr. Frazier's case,

21          they all agreed that his mental illness made him even less likely to

22          protest the denial of his rights.

23    n.    From 2006 until 2014, less than four SVP cases were brought to trial

24          annually by the attorneys in the SVP Unit.  Mr. Frazier's SVP case was

25          twelve years old in 2014 and he had been waiting for his trial twelve

---

[1] Defendant Michael Suzuki was the representative from the PD's Office who signed
the MOU on behalf of the PD's Office, and he participated in the formulation,
adoption and implementation of this MOU.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

years in custody.  During each of those years, defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office discussed the status of his case, acknowledged that it was not moving to trial in a timely manner, and agreed that they would not declare "unavailability" in Mr. Frazier's case so as to ensure that he would be assigned to private counsel to move his case to trial promptly.

o.  In 2014, defendant Ridley-Thomas learned that the PD's Office would be cutting the staff level of the SVP unit by at least 50 percent. Defendant Ridley-Thomas learned from defendant Ronald Brown and the other managers and administrators of the PD's Office that this would cause the already-existing delay in the processing of cases to trial to be drastically exacerbated.  In discussing the staff reduction, defendant Ridley-Thomas learned that Mr. Frazier's case would be further delayed. He and Ronald Brown and the other managers and administrators of the PD's Office acknowledged that the staff reduction would cause Mr. Frazier to remain in custody for an indefinite amount of time because the staff reduction would essentially put a stop to the processing of cases by the SVP staff because they simply had too many cases to effectively handle.

p.  During the time that the SVP staff reduction was being contemplated during January through April of 2014, this defendant received letters and memoranda from the attorneys and staff in the SVP Unit which informed this defendant that the proposed staff reductions would make them ineffective under law in their ability to assist their SVP clients.  The letters and memoranda, all of which were hand-delivered to this defendant, informed this defendant that the reduction in staff would cause the further delay in the already unconscionably and

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

unconstitutionally slow processing of the SVP cases.  The letters and memoranda expressly informed this defendant that the staff reductions would cause the violation of the due process rights and speedy trial rights of the SVP clients.   During the regular monthly discussions about the management of the PD's Office, this defendant learned that Mr. Frazier's case was already at least eight years old and that the staff reductions in the SVP unit would cause Mr. Frazier's case to remain in limbo, without trial, for an indefinite period of time thereafter.

q.   In the discussion of the impact of the staff reductions during March and April of 2014, defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office discussed the option of PD's Office declaring "unavailability" in Mr. Frazier's case.  This would have ensured that his case would have gotten to trial in speedy fashion after being transferred to private counsel.   This option was viable, but because of a conflict of interest, this defendant decided that the PD's Office would not declare a conflict in Mr. Frazier's case, thereby essentially abandoning Mr. Frazier's case to an indefinite state of delay.

r.   During the discussion of the issuance of a declaration of unavailability in Mr. Frazier's case, defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office discussed the implications of *People v. Litmon*, (2008) 76 Cal. Rptr. 3d 122, where it was held that a delay as short as 11 months in the bringing of an SVP case to trial could constitute a violation of due process rights and speedy trial rights.   During their discussions in March and April of 2014, these defendants acknowledged that they were now in a conflict of interest with Mr. Frazier because his case was now inordinately old – 12 years, and that the delay in bringing his case to trial was due to their chronic

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

mismanagement of the SVP Unit, including the breached agreement/MOU of 2007.  Rather than inform the court of the conflict of interest or declare the PD's Office unavailable in Mr. Frazier's case, defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office agreed to retain Mr. Frazier's case within the SVP Unit so as to conceal their conflict of interest and avoid civil liability.

22.    Defendant Hilda Solis:

a.    At all times relevant hereto defendant Hilda Solis was a resident of the County of Los Angeles.  She is and has been a member of the Board of Supervisors of Los Angeles County since 2014.  As part of her duties as a member of the Los Angeles County Board of Supervisors, she was assigned with the administrative responsibility of directly overseeing, managing, directing and/or controlling defendant Law Offices of the Los Angeles County Public Defender.  With respect to her oversight, management and supervision of the Law Offices of the Los Angeles County Public Defender, Hilda Solis did not have to seek authorization from the Board of Supervisors for her decisions, none of such decisions were required to be put before the Board of Supervisors for approval in the form of resolutions, policy determinations or other legislative acts. The acts and omissions of Hilda Solis alleged herein were made on a case-by-case basis.

b.    With respect to all conduct alleged herein, defendant Hilda Solis acted under the color of law.

///
///
///

27

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

c. Per her responsibilities to manage, supervise and administer the Law Offices of the Los Angeles County Public Defender and its SVP Unit, Defendant Hilda Solis had the authority to:

    i. instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to declare that the public defender's office is "unavailable" and thereby have a case assigned to The Alternate Public Defender of Los Angeles County or to a private panel attorney;

    ii. develop and implement specific training programs for all personnel in the Law Offices of the Los Angeles County Public Defender, including deputy public defenders,

    iii. instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to replace or reassign personnel within the Law Offices of the Los Angeles County Public Defender; and,

    iv. instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to order subordinate personnel, to take specific actions in particular cases.

d. Defendant Hilda Solis oversaw, monitored and/or managed defendant The Law Offices of the Los Angeles County Public Defender.  In carrying out her oversight of said office, he met monthly, and often more regularly, with defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to discuss and carry out the operation and management of The Law Offices of the Los Angeles County Public Defender.  At all relevant times hereto, Defendant Hilda Solis had the authority to order or otherwise compel defendant The Office of the Public Defender and defendants

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael

2   Suzuki, Daniel Kuperberg and Ruben Marquez to "declare

3   unavailability" in specific SVP cases.  The PD's office often declared

4   "unavailability" in non-SVP cases with the consent of defendant Hilda

5   Solis.

6   e.   These regular meetings included discussions of the SVP Unit, its case

7   load, individual cases handled by said unit - including Mr. Frazier's

8   case, the backlog of work in the unit, the understaffing of that unit, and

9   the extended time periods that SVP Unit clients were being detained.

10   f.   Defendant Hilda Solis requested and received regular memoranda,

11   emails, reports, budget requests, and other written correspondence and

12   documents from defendants Ronald Brown, Kelly Emling, Laura Green,

13   Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez

14   and other members of the Public Defender's Office regarding the

15   management and operation of the SVP Unit, including the status of Mr.

16   Frazier's civil detention proceedings. Defendant Hilda Solis had specific

17   knowledge regarding Plaintiff's civil detention proceedings and, as

18   spelled out herein below, was deliberately indifferent to the violation of

19   Mr. Frazier's civil rights.   Defendant Hilda Solis was aware of the

20   present plaintiff's SVP case, the long delay in getting his case to trial,

21   and the unconstitutional customs and practices which caused the delays

22   in getting Plaintiff's case to trial.

23   g.   Defendant Hilda Solis is sued in her personal capacity as a supervisor

24   and administrator for her own culpable action or inaction related to the

25   management of Mr. Frazier's case, and for her specific conduct and

26   deliberate indifference which resulted in the violation of the present

27   Plaintiff's constitutional rights.  She is also sued in her personal capacity

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

for her acquiescence in, and ratification of, the constitutional deprivations which this complaint alleges and for her conduct which showed a reckless or callous indifference to the rights of the present plaintiff.  This defendant's affirmative conduct, as described herein below, involves her acquiescence to, and ratification of specific conduct carried out by her subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

h.   With respect to the individual cases handled by the PD's office, defendant Hilda Solis often managed individual cases that were being handled by the PD's Office.  In her role as a supervisor and administrator of the Office of the Public Defender, she was allowed to, and did, deal with individual cases that were assigned to the PD's office. This defendant would either request that the client's file be brought to her office or inquire directly with Ronald Brown, or other supervisors in the PD's Office as to individual cases. She would instruct the Ronald Brown and her subordinates as to the management of the case, push for a particular outcome, and demand that the particular case be resolved in a particular way.

i.   In 2014, upon her taking office as a member of the Board of Supervisors and taking on her role as an administrator of the PD's Office, this defendant learned that the PD's Office could not bring SVP cases to trial because the volume of cases had overwhelmed the SVP staff and they could not process the cases to trial in a reasonable time and that as a result, a significant backlog of cases had arisen.   This defendant was informed by Ronald Brown and the PD's managers and administrators that there existed in since 2006 a large backlog of cases in the SVP Unit

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

of the PD's Office. This defendant was informed of the SVP cases that had been awaiting trial the longest and she learned of Mr. Frazier's case as it was one of the oldest pending cases.  She was informed that if private counsel was not appointed for Mr. Frazier, his case would linger indefinitely in the PD's office without going to trial because the PD's Office was overwhelmed with cases much older than Mr. Frazier's case.

j.    Between 2014 and 2018, defendant Hilda Solis, Ronald Brown and the PD's managers and administrators continued to meet every month to discuss the management of the PD's Office.  During many of these meetings, they discussed Mr. Frazier's case.   Defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office recognized at each meeting that the SVP Unit was overwhelmed with work and that the delays in cases getting to trial were continuing to grow every year.  They accepted that the SVP clients would not be getting a speedy trial.  They agreed that because of the unsavory allegations against these clients, that there would be little negative consequences to them if the SVP cases were delayed.  In discussing Mr. Frazier's case, they all agreed that his mental illness made him even less likely to protest the denial of his rights.

k.    In 2014, defendant Hilda Solis learned that the PD's Office would be cutting the staff level of the SVP unit by at least 50 percent.  This concerned defendant Solis given that she had been just informed of the great delays in the bringing of the SVP cases to trial.  Defendant Ridley-Thomas Hilda Solis learned from defendant Ronald Brown and the other managers and administrators of the PD's Office that this would cause the already-existing delay in the processing of cases to trial to be drastically exacerbated.  In discussing the staff reduction, defendant Hilda Solis

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

learned that Mr. Frazier's case would be further delayed.  She and Ronald Brown and the other managers and administrators of the PD's Office acknowledged that the staff reduction would cause Mr. Frazier to remain in custody for an indefinite amount of time because the staff reduction would essentially put a stop to the processing of cases by the SVP staff because they simply had too many cases to effectively handle.

l.      During the time that the SVP staff reduction was being contemplated during January through April of 2014, this defendant received letters and memoranda from the attorneys and staff in the SVP Unit which informed this defendant that the proposed staff reductions would make them ineffective under law in their ability to assist their SVP clients.  The letters and memoranda, all of which were hand-delivered to this defendant, informed this defendant that the reduction in staff would cause the further delay in the already unconscionably and unconstitutionally slow processing of the SVP cases.  The letters and memoranda expressly informed this defendant that the staff reductions would cause the violation of the due process rights and speedy trial rights of the SVP clients.   During the regular monthly discussions about the management of the PD's Office, this defendant learned that Mr. Frazier's case was already at least twelve years old in 2014 and that the staff reductions in the SVP unit would cause Mr. Frazier's case to remain in limbo, without trial, for an indefinite period of time thereafter.

m.      In the discussions of the impact of the staff reductions during March and April of 2014, defendant Hilda Solis, Ronald Brown and the other managers and administrators of the PD's Office discussed the option of PD's Office declaring "unavailability" in Mr. Frazier's case.  This would have ensured that his case would have gotten to trial in speedy fashion

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

after being transferred to private counsel.   This option was viable, but because of a conflict of interest, this defendant decided that the PD's Office would not declare a conflict in Mr. Frazier's case, thereby essentially abandoning Mr. Frazier's case to an indefinite state of delay.

n.   During the discussion of the issuance of a declaration of unavailability in Mr. Frazier's case, defendant Hilda Solis, Ronald Brown and the other managers and administrators of the PD's Office discussed the implications of *People v. Litmon*, (2008) 76 Cal. Rptr. 3d 122, where it was held that a delay as short as 11 months in the bringing of an SVP case to trial could constitute a violation of due process rights and speedy trial rights.   During their discussions in March and April of 2014, these defendants acknowledged that they were now in a conflict of interest with Mr. Frazier because his case was now inordinately old – 12 years, and that the delay in bringing his case to trial was due to their chronic mismanagement of the SVP Unit, including the breached agreement/MOU of 2007, which was explained to this defendant. Rather than inform the court of the conflict of interest or declare the PD's Office unavailable in Mr. Frazier's case, defendant Hilda Solis, Ronald Brown and the other managers and administrators of the PD's Office agreed to retain Mr. Frazier's case within the SVP Unit so as to conceal their conflict of interest and avoid civil liability.

o.   In March and April of 2014, this defendant was also informed of pending litigation against the state of California regarding the funding for SVP cases.  The state had withdrawn or limited the amount of funding that it had previously disbursed to counties.  The County of Los Angeles was suing the State to have the funding levels reinstated. Through the discussion of this litigation, defendant Solis was further

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  informed that the SVP Unit at the PD's Office was dramatically under
2  understaffed, that the work load exceeded the attorneys' ability to
3  effectively manage their cases, that SVP clients were being so neglected
4  that their cases were being delayed to such an extent that the clients'
5  constitutional rights were being violated, and that Mr. Frazier's case was
6  one of these neglected cases.

7  23.   Defendant Sheila Kuehl:

8  a.   At all times relevant hereto defendant Sheila Kuehl was a resident of the
9  County of Los Angeles.  She is and has been a member of the Board of
10  Supervisors of Los Angeles County since 2014.  As part of her duties as
11  a member of the Los Angeles County Board of Supervisors, she was
12  assigned with the administrative responsibility of directly overseeing,
13  managing, directing and/or controlling defendant Law Offices of the Los
14  Angeles County Public Defender.  With respect to her oversight,
15  management and supervision of the Law Offices of the Los Angeles
16  County Public Defender, Sheila Kuehl did not have to seek authorization
17  from the Board of Supervisors for her decisions, none of such decisions
18  were required to be put before the Board of Supervisors for approval in
19  the form of resolutions, policy determinations or other legislative acts.
20  The acts and omissions of Sheila Kuehl alleged herein were made on a
21  case-by-case basis.

22  b.   With respect to all conduct alleged herein, defendant Sheila Kuehl acted
23  under the color of law.

24  ///
25  ///
26  ///
27  ///
28

34

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

c.   Per her responsibilities to manage, supervise and administer the Law Offices of the Los Angeles County Public Defender and its SVP Unit, Defendant Sheila Kuehl had the authority to:

   i.   instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to declare that the public defender's office is "unavailable" and thereby have a case assigned to The Alternate Public Defender of Los Angeles County or to a private panel attorney;

   ii.   develop and implement specific training programs for all personnel in the Law Offices of the Los Angeles County Public Defender, including deputy public defenders,

   iii.   instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to replace or reassign personnel within the Law Offices of the Los Angeles County Public Defender; and,

   iv.   instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to order subordinate personnel, to take specific actions in particular cases.

d.   Defendant Sheila Kuehl oversaw, monitored and/or managed defendant The Law Offices of the Los Angeles County Public Defender.  In carrying out her oversight of said office, he met monthly, and often more regularly, with defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to discuss and carry out the operation and management of The Law Offices of the Los Angeles County Public Defender.  At all relevant times hereto, Defendant Sheila Kuehl had the authority to order or otherwise compel defendant The Office of the Public Defender and defendants

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to "declare unavailability" in specific SVP cases.  The PD's office often declared "unavailability" in non-SVP cases with the consent of defendant Sheila Kuehl.

e.    These regular meetings included discussions of the SVP Unit, its case load, individual cases handled by said unit - including Mr. Frazier's case, the backlog of work in the unit, the understaffing of that unit, and the extended time periods that SVP Unit clients were being detained.

f.    Defendant Sheila Kuehl requested and received regular memoranda, emails, reports, budget requests, and other written correspondence and documents from defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez and other members of the Public Defender's Office regarding the management and operation of the SVP Unit, including the status of Mr. Frazier's civil detention proceedings. Defendant Sheila Kuehl had specific knowledge regarding Plaintiff's civil detention proceedings and, as spelled out herein below, was deliberately indifferent to the violation of Mr. Frazier's civil rights.   Defendant Sheila Kuehl was aware of the present plaintiff's SVP case, the long delay in getting his case to trial, and the unconstitutional customs and practices which caused the delays in getting Plaintiff's case to trial.

g.    Defendant Sheila Kuehl is sued in her personal capacity as a supervisor and administrator for her own culpable action or inaction related to the management of Mr. Frazier's case, and for her specific conduct and deliberate indifference which resulted in the violation of the present Plaintiff's constitutional rights.  She is also sued in her personal capacity

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

for her acquiescence in, and ratification of, the constitutional deprivations which this complaint alleges and for her conduct which showed a reckless or callous indifference to the rights of the present plaintiff.  This defendant's affirmative conduct, as described herein below, involves her acquiescence to, and ratification of specific conduct carried out by her subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

h.    With respect to the individual cases handled by the PD's office, defendant Sheila Kuehl often managed individual cases that were being handled by the PD's Office.  In her role as a supervisor and administrator of the Office of the Public Defender, she was allowed to, and did, deal with individual cases that were assigned to the PD's office. This defendant would either request that the client's file be brought to her office or inquire directly with Ronald Brown, or other supervisors in the PD's Office as to individual cases. She would instruct the Ronald Brown and her subordinates as to the management of the case, push for a particular outcome, and demand that the particular case be resolved in a particular way.

i.    In 2014, upon her taking office as a member of the Board of Supervisors and taking on her role as an administrator of the PD's Office, this defendant learned that the PD's Office could not bring SVP cases to trial because the volume of cases had overwhelmed the SVP staff and they could not process the cases to trial in a reasonable time and that as a result, a significant backlog of cases had arisen.   This defendant was informed by Ronald Brown and the PD's managers and administrators that there existed in since 2006 a large backlog of cases in the SVP Unit

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

of the PD's Office. This defendant was informed of the SVP cases that had been awaiting trial the longest and she learned of Mr. Frazier's case as it was one of the oldest pending cases.  She was informed that if private counsel was not appointed for Mr. Frazier, his case would linger indefinitely in the PD's office without going to trial because the PD's Office was overwhelmed with cases much older than Mr. Frazier's case.

j.      Between 2014 and 2018, defendant Sheila Kuehl, Ronald Brown and the PD's managers and administrators continued to meet every month to discuss the management of the PD's Office.  During many of these meetings, they discussed Mr. Frazier's case.   Defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office recognized at each meeting that the SVP Unit was overwhelmed with work and that the delays in cases getting to trial were continuing to grow every year.  They accepted that the SVP clients would not be getting a speedy trial.  They agreed that because of the unsavory allegations against these clients, that there would be little negative consequences to them if the SVP cases were delayed.  In discussing Mr. Frazier's case, they all agreed that his mental illness made him even less likely to protest the denial of his rights.

k.      In 2014, defendant Sheila Kuehl learned that the PD's Office would be cutting the staff level of the SVP unit by at least 50 percent.  This concerned defendant Solis given that she had been just informed of the great delays in the bringing of the SVP cases to trial.  Defendant Ridley-Thomas Sheila Kuehl learned from defendant Ronald Brown and the other managers and administrators of the PD's Office that this would cause the already-existing delay in the processing of cases to trial to be drastically exacerbated.  In discussing the staff reduction, defendant

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Sheila Kuehl learned that Mr. Frazier's case would be further delayed. She and Ronald Brown and the other managers and administrators of the PD's Office acknowledged that the staff reduction would cause Mr. Frazier to remain in custody for an indefinite amount of time because the staff reduction would essentially put a stop to the processing of cases by the SVP staff because they simply had too many cases to effectively handle.

l. During the time that the SVP staff reduction was being contemplated during January through April of 2014, this defendant received letters and memoranda from the attorneys and staff in the SVP Unit which informed this defendant that the proposed staff reductions would make them ineffective under law in their ability to assist their SVP clients. The letters and memoranda, all of which were hand-delivered to this defendant, informed this defendant that the reduction in staff would cause the further delay in the already unconscionably and unconstitutionally slow processing of the SVP cases. The letters and memoranda expressly informed this defendant that the staff reductions would cause the violation of the due process rights and speedy trial rights of the SVP clients. During the regular monthly discussions about the management of the PD's Office, this defendant learned that Mr. Frazier's case was already at least twelve years old in 2014 and that the staff reductions in the SVP unit would cause Mr. Frazier's case to remain in limbo, without trial, for an indefinite period of time thereafter.

m. In the discussions of the impact of the staff reductions during March and April of 2014, defendant Sheila Kuehl, Ronald Brown and the other managers and administrators of the PD's Office discussed the option of PD's Office declaring "unavailability" in Mr. Frazier's case. This would

39

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

have ensured that his case would have gotten to trial in speedy fashion after being transferred to private counsel.   This option was viable, but because of a conflict of interest, this defendant decided that the PD's Office would not declare a conflict in Mr. Frazier's case, thereby essentially abandoning Mr. Frazier's case to an indefinite state of delay.

n.   During the discussion of the issuance of a declaration of unavailability in Mr. Frazier's case, defendant Sheila Kuehl, Ronald Brown and the other managers and administrators of the PD's Office discussed the implications of *People v. Litmon*, (2008) 76 Cal. Rptr. 3d 122, where it was held that a delay as short as 11 months in the bringing of an SVP case to trial could constitute a violation of due process rights and speedy trial rights.   During their discussions in March and April of 2014, these defendants acknowledged that they were now in a conflict of interest with Mr. Frazier because his case was now inordinately old – 12 years, and that the delay in bringing his case to trial was due to their chronic mismanagement of the SVP Unit, including the breached agreement/MOU of 2007, which was explained to this defendant. Rather than inform the court of the conflict of interest or declare the PD's Office unavailable in Mr. Frazier's case, defendant Sheila Kuehl, Ronald Brown and the other managers and administrators of the PD's Office agreed to retain Mr. Frazier's case within the SVP Unit so as to conceal their conflict of interest and avoid civil liability.

o.   In March and April of 2014, this defendant was also informed of pending litigation against the state of California regarding the funding for SVP cases.  The state had withdrawn or limited the amount of funding that it had previously disbursed to counties.  The County of Los Angeles was suing the State to have the funding levels reinstated.

40

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1
2
3
4
5
6
7

Through the discussion of this litigation, defendant Solis was further informed that the SVP Unit at the PD's Office was dramatically under understaffed, that the work load exceeded the attorneys' ability to effectively manage their cases, that SVP clients were being so neglected that their cases were being delayed to such an extent that the clients' constitutional rights were being violated, and that Mr. Frazier's case was one of these neglected cases.

8

**Public Entity Defendants**

9   24.   Defendant County of Los Angeles:  At all times mentioned herein,
10  defendant County of Los Angeles was a public entity duly organized and existing
11  under and by virtue of the laws of the state of California, with the capacity to sue and
12  be sued.  Defendant County of Los Angeles is responsible for the actions, omissions,
13  policies, procedures, practices and customs of its various agents, departments,
14  subdivisions and agencies.  Defendant County of Los Angeles operates, manages,
15  directs and/or controls defendant Law offices of the Los Angeles County Public
16  Defender which is also a separate public entity. At all times relevant to the facts
17  alleged herein, Defendant County of Los Angeles was responsible for assuring that
18  the actions, omissions, policies, procedures, practices and customs of its departments,
19  subdivisions, and employees, complied with Constitution of the United States.

20  25.   Defendant Law office of the Los Angeles County Public Defender: At
21  all times mentioned herein, defendant Law offices of the Los Angeles County Public
22  Defender was a public entity, and subdivision of the County of Los Angeles, duly
23  organized and existing under and by virtue of the laws of the state of California and
24  the Charter of the County of Los Angeles, with the capacity to sue and be sued.
25  Defendant Law Offices of the Los Angeles County Public Defender is responsible for
26  the actions, omissions, policies, procedures, practices and customs of its various
27  agents, departments, subdivisions and Units, including its SVP Unit. According to

28

1  defendant Law Offices of the Los Angeles County Public Defender, its SVP Unit was
2  established to defend those persons who were being committed to state mental
3  institutions for potentially an indefinite term of commitment, and that its SVP Unit
4  consists of experienced attorneys and paralegals practicing exclusively in this highly
5  specialized area of law.

6       26.    DOE defendants 1 through 10, inclusive and each of them, are and were
7  at all times relevant here, members of the Los Angeles County Board of Supervisors,
8  appointed or elected officials of the County of Los Angeles, and agents, employees
9  and/or representatives of defendant County of Los Angeles acting within their
10 capacity as employees, agents and servants of the defendant County of Los Angeles
11 and/or Law Offices of the Los Angeles County Public Defender.  Said defendants
12 were policymakers with the authority to develop, modify, amend, ratify, implement,
13 revoke, and rescind all policies, practices, procedures and customs of the Law Offices
14 of the Los Angeles County Public Defender.  Said defendants, at all times alleged
15 herein, where acting within said course and scope of that employment and agency,
16 and at all times relevant hereto were acting under the color of law.  Said Defendants
17 are sued individually and in their personal capacity as supervisors, employees, agents
18 and/or representatives of defendant County of Los Angeles.

19      27.    The present plaintiff is ignorant of the true names and capacities of
20 defendants sued herein as DOE defendants 1 through 10, inclusive, and therefore sues
21 these defendants by such fictitious names.  Plaintiff will amend this complaint to
22 allege their true names and capacities when ascertained.  Plaintiff is informed and
23 believe and thereon allege that each of the fictitiously named defendants is
24 responsible in some manner for the occurrences herein alleged, and that Plaintiff's
25 injuries as herein alleged were proximately caused by the acts and/or omissions of
26 said fictitiously named defendants.
27 ///
28

42

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1

2

## V.

3

## STATEMENT OF RELEVANT FACTS

4

## A.

5

6

7

**The Los Angeles County Superior Court has determined that Mr. Frazier's Due Process rights were violated by the 18-year pre-trial detention.**

8

9

10

11

12

28.     On December 16, 2020, the Honorable Brian F. Gasdia, Judge of the Los Angeles County Superior Court, issued an order finding that the 18-year pre-trial detention of Mr. Frazier violated his due process rights under the Fourteenth Amendment of the US Constitution, and he dismissed the petition for civil detention, which was filed on June 19, 2002.

13

14

15

16

17

18

29.     Judge Gasdia's order notes that a delay of less than one year in getting to trial on an SVP petition may alone violate a detainee's due process rights, citing *Doggett v. United States*, 505 U.S.at p. 652, fn. 1.  Judge Gasdia further noted "that 17 years of pre-trial detention is presumptively prejudicial and oppressive to the maximum degree."  *People v. Superior Court*, (2018) 27 Cal.App.5th 36, 54 (*Vasquez*).

19

20

21

30.     As part of the hearing in determining whether Mr. Frazier's due process rights had been violated, Judge Gasdia heard testimony from three of the Deputy Public Defenders that had represented Mr. Frazier.

22

23

24

25

26

31.     Guided by *Vasquez*, *Litmon*, and *People v. DeCasas*, (2020) 54 Cal.App.5th 785 in order to determine if there has been a violation of plaintiff's due process rights and speedy trial rights, Judge Gasdia applied the tests established by the United States Supreme Court in *Mathews v. Eldridge*, (1976) 424 U.S. 319 and *Barker v. Wingo*, (1972) 407 U.S. 514, and the court concluded as follows:

27

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

a.   Mr. Frazier's 18 years of pre-trial confinement constituted a pretrial delay and that it was presumptively prejudicial and "oppressive to the maximum degree," requiring due process protection;

b.   Several attorneys in the SVP Unit testified that upper management of the Los Angeles County Public Defender's Office did not respond to their complaints, and there was further testimony that indicated that retaliatory transfers occurred. There was not a single decision made by upper management in the Public Defender's Office that was in the best interest of the SVP clients, including Mr. Frazier. This is the systemic breakdown;

c.   Mr. Frazier asserted his speedy trial rights, and sent a letter to Judge Gasdia describing the "Hobson's choice" he faced when he reluctantly agreed in 2016 to continue his trial provided his then-SVP attorney, Terry Shenkman, remain his attorney and be permitted to prepare his case for trial and not be transferred off his case.  The Public Defender's Office transferred her, and Judge Gasdia ruled that Mr. Frazier had not waived his right to a speedy trial;

d.   Judge Gasdia noted that Mr. Frazier's letter is a one page description of the "Hobson's choice" Mr. Frazier was facing, the choice that he made, and is much more than the "enough is enough" comment made by George Vasquez, discussed in his and the *DeCasas* cases;

e.   Judge Gasdia found that Mr. Frazier, also, had **both** the right to a speedy trial **and** that the right to competent, prepared counsel and that his letter proved that one gave way to the other;

f.   Like *Vasquez*[2], Mr. Frazier was forced to acquiesce to his counsel's demand for more time and forced to choose between proceeding to trial

---

[2] The appellant in *Vasquez*, George Vasquez, was also represented by the Los Angeles County Public Defenders' Office, including by some of the same attorneys, and he

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

without prepared counsel or giving up his right to speedy trial.  He had the proverbial "Hobson's choice;"

g.    Had his case been brought to trial in a timely fashion and had he been committed, he would have been committed for only a two-year period;

h.    There was ample testimony about the Los Angeles County Public Defender's Office's budget cuts and the effect it had on the lack of timeliness of SVP cases, including Mr. Frazier's;

i.    There existed no fiscal or administrative burdens on the government that could have possibly justified the lengthy pre-trial detention suffered by Mr. Frazier and, in fact, it would not have been any more of a fiscal or administrative burden on the government to bring Mr. Frazier to trial at the beginning of his case;

j.    Mr. Frazier's involuntary commitment was presumptively prejudicial, particularly in light of the fact that he only faced a 2-year commitment on the original petition;

k.    The prejudice "could not be more clear," considering the fact that Mr. Frazier had two negative evaluations, which found that he did not meet the criteria to be found an SVP;

l.    Judge Gasdia noted, "As the *Litmon*… court observed, time once passed can never be recovered."  Judge Gasdia agreed;

m.    The court found that Mr. Frazier had a substantial liberty interest and, in light of the negative evaluations in his favor, the risk of an erroneous involuntary confinement was substantial, satisfying the first two prongs of the *Mathews* test;

---

spent 17 years in custody awaiting trial in his SVP proceedings.  Both Mr. Vasquez and Mr. Frazier were concurrently in SVP proceedings at the time that the Los Angeles County Public Defenders' office has been deemed to have been in a state of a "systemic breakdown."

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

n.    The court found that each of Mr. Frazier's trial dates were continued as a result of "a systemic 'breakdown in the public defender system.'"

32.    The court concluded that the lengthy detention was not of Mr. Frazier's own making, that Mr. Frazier's trial dates were continued for due to systemic breakdowns in the public defender's system, and that he was faced with a Hobson's choice of acquiescing to his attorney's strategies, whatever they were, or go to trial with an attorney that was not timely prepared.  As such, the court rejected the argument that Mr. Frazier was not responsible for the long delay.

33.    Ultimately, the court concluded that there was "overwhelming" evidence that the long pre-trial detention of Mr. Frazier showed a constitutional deprivation of both his speedy trial rights and due process rights.

**B.**

**By 2006, there was already an institutional breakdown of the Public Defender System in Los Angeles County.**

34.    In the *Vasquez* case, both the trial court and the Court of Appeal of the State of California concluded that "the dysfunctional manner in which the public defender's office handled … Vasquez's case was precisely the type of systemic or institutional breakdown contemplated [by controlling authority]."  *Vasquez*, 27 Cal. App. 5th at 73.

35.    A state of institutional breakdown existed as early as 2006 in the PD's Office.  In 2007, the Superior Court of Los Angeles County brokered an agreement with the PD's Office and the Office of the District Attorney to attempt to address the inability of the PD's Office to bring SVP cases to trial. In the Memorandum of Understanding that memorialized the agreement, the parties stipulated to the inability of the PD's Office to promptly bring SVP cases to trial.

36.    The agreement resulted from the enactment of new legislation in October of 2006 related to SVP proceedings and the term of commitment for those

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

individuals who were adjudicated under the SVP Act. The new legislation made the term of commitment indefinite rather than two years.  The legislation applied to 64 pending SVP petitions which were being defended against by the PD's Office.   Mr. Frazier's case was one of those 64 cases.

37.     This agreement provided that the PD's Office would bring the 64 cases to trial within 24 months.  The majority of the cases subject to this agreement were at least three years old by the time the agreement was entered into.

38.     Shortly after entering into the agreement, defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez determined that the SVP unit did not have the staff and other resources to bring the 64 cases to trial within the 24 months they had agreed to.   This put the 64 SVP clients at risk of losing the benefit of the two-year commitment term. Likewise, this also put the PD's Office in conflict of interest.  The lawyers in the SVP unit had to choose which clients would go to trial in the 24-month period and which clients would not.

39.     Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez realized that this created an ethical and liability problem for them and the PD's Office.  Accordingly, they sought to be relieved as counsel in the 64 cases.

40.     These defendants did not inform Mr. Frazier or the other 63 SVP clients of this agreement, of their intention to be relieved as counsel or of the implications of not bringing their cases to trial within 24 months, including the impact of being committed to state civil detention for an indefinite period.

41.     After several months of effort, the Superior Court determined that it could not find an adequate number of private attorneys willing and qualified to assume representation of the SVP clients that the PD's Office was unable to handle. SVP litigation was, and is, meaningfully different than normal criminal defense work.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   SVP cases consist of voluminous files, complex medical issues are intertwined with

2   the legal issues, and extensive expert evaluations are essential to the successful

3   defense of these cases.  Although brought by prosecutors and pursued in the criminal

4   courts, SVP cases are civil cases with all the proceedings common in civil litigation

5   that are, for the most part, foreign to criminal practitioners, such as the taking of

6   depositions.   The field is so specialized that very few private practitioners in

7   California practice SVP defense.

8       42.     Because the court could not find adequate numbers of private attorneys

9   to handle the subject 64 cases, the court, the PD's Office and the DA's office entered

10  into another agreement regarding Mr. Frazier's case and the other 63 cases.  The

11  District Attorney's Office offered to withdraw the 24-month time limit to bring the

12  cases to trial, if the PD's Office agreed to retain the cases.  The agreement, however,

13  also provided that the 64 SVP clients waive their right to have their case brought to

14  trial promptly, within the 24-month period, so as to avoid indefinite commitment.

15  Defendant Michael Suzuki was the representative from the PD's Office that signed

16  the memorandum of understanding.

17      43.     The intention of the agreement was to ensure that Mr. Frazier and the

18  other 63 SVP clients would have "competent representation and that they would not

19  be deprived of due process because of a lack of County, attorney and judicial

20  resources."  This intent was never honored by the County of Los Angeles, the PD's

21  Office, or defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green,

22  Michael Suzuki, Daniel Kuperberg, and Ruben Marquez

23      44.     Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green,

24  Michael Suzuki, Daniel Kuperberg, and Ruben Marquez accepted this agreement and

25  agreed to retain all of the 64 cases.  They did not notify Mr. Frazier, or the other 64

26  SVP clients, that they had waived their right to speedy trial and that the PD's Office

27  had agreed to risk their indefinite commitment.

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

45.     The agreement was memorialized in a memorandum of understanding in May of 2007 and provided for the continuing representation by the PD's Office of Mr. Frazier and the other 63 SVP clients that were subject to the new legislation.  The previously-agreed-to 24-month time period to bring Mr. Frazier's case to trial was waived by the PD's Office and the County of Los Angeles agreed to provide additional resources to the PD's Office to enable the PD's Office to handle the increased workload and so these cases would be brought to trial promptly and competently.

46.     The County of Los Angeles provided more than $1,200,000 to the Public Defender's Office to ensure that the retained SVP cases would be competently brought to trial.  The PD's Office and defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez accepted these resources but did not dedicate any of the funding to the SVP unit. They did not hire or transfer new lawyers to work in the SVP Unit nor did they did change the way they managed SVP cases.  They did not modify the structure of the SVP Unit in any way, or otherwise meaningfully change the way they defended SVP cases so as to ensure that their SVP clients would receive "competent representation and that they would not be deprived of due process because of a lack of County, attorney and judicial resources."

47.     To the contrary, nothing changed.  The admitted inability to bring these cases to trial promptly, the conflicts of interest, and the essential abandonment of their SVP clients persisted.  Mr. Frazier's case remained with the SVP Unit. After his probable cause hearing, he was not contacted by any lawyer from the SVP Unit within the first five years after he was transferred to the state hospital system.  Not until 2018, when private counsel was appointed to represent Mr. Frazier, did he have any meaningful work done on his case. Shortly thereafter, his case was dismissed.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

48.     From 2007, when the above agreement was entered into, until approximately April of 2014, the SVP unit remained under-staffed, overworked and unable to handle the amount of SVP cases that were assigned to it.  None of the 64 cases, including Mr. Frazier's case, were brought to trial in the previously contemplated 24-months.  In fact, because of the overwhelming amount of cases and related work that each of the lawyers in the SVP Unit had to manage, between 2007 and 2014 less than four SVP cases were brought to trial each year by the PD's Office. The same institutional breakdown that the courts have recognized as having existed in the PD's Office between 2014 and 2018 also existed between 2002 to 2014.

## C.

### Plaintiff's 18-year ordeal as an SVP pre-trial detainee.

49.     Mr. Frazier served a 10-year sentence in state prison.  Near the end of his sentence, and before he was released from prison, the Los Angeles County District Attorney's office filed a petition for civil commitment pursuant to California *Welfare & Institutions Code*, section 6600 et seq.  On June 19, 2002, the Superior Court issued an order for Mr. Frazier's removal from prison so he could be arraigned on the petition.

50.     Throughout the majority of Mr. Frazier's 18-year detention, he was represented by attorneys from the Public Defender's Office.

51.     At the outset of his involuntary pretrial detention, Mr. Frazier sent the judge initially assigned his case, Judge Henry Barela, a 9-page letter dated September 27, 2003, complaining of the delays on the part of the Public Defender's Office in bringing his case to trial.

52.     Thereafter, from 2003 through 2010, Mr. Frazier was in treatment at Coalinga State Hospital.

53.     The first Deputy Public Defender that represented Mr. Frazier began his representation in 2002.  This Deputy Public Defender (hereafter "DPD1") continued

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

as Mr. Frazier's appointed attorney to represent him through 2013.  DPD1 is not a defendant in the present action.

54.     On March 13, 2013, DPD2 was identified for the first time as Mr. Frazier's assigned Public Defender rather than DPD1.  In November 2013, DPD2 was transferred from the SVP Unit and a new deputy public defender was assigned to Mr. Frazier.

55.     On November 21, 2013, DPD3 made his first appearance on behalf of Mr. Frazier.  The case was transferred to Judge Elaine Mandel.  The pretrial conference was continued to February 10, 2014.

56.     On February 10, 2014, the pretrial conference was continued to May 12, 2014, and Judge Mandel's notes indicated that trial was set to go forward in November 2014 and DPD3 was to get experts prepared as soon as possible.

57.     On May 12, 2014, the pretrial conference was continued to July 21, 2014, and the judge was still anticipating a trial in October or November 2014. Again, the judge's notes indicate that she ordered DPD3 to have experts prepared and ready "ASAP."

58.     On July 21, 2014, Judge Mandel ordered the parties to meet and confer over polygraph test issues and continued the pretrial conference to July 31, 2014.

59.     On July 31, 2014, the case was transferred from Judge Mandel to Judge Thomas I. McKnew and the pretrial conference was set for August 7, 2014.

60.     Following the hearing on August 7, 2014, Judge McKnew, on October 15, 2014, ordered updated evaluations.

61.     There were no substantive hearings until March and April of 2015, at which point the court was continuing to order updated evaluations.  A further pretrial conference was set for June 16, 2015.

62.     On June 16, 2015, Judge McKnew retired and the case was transferred to Judge Gasdia and set for hearing on July 7, 2015.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

63.     On July 7, 2015, Judge Gasdia set the matter for trial on November 9, 2015, with a pretrial/motion/trial readiness conference set for October 5, 2015.

64.     On October 5, 2015, DPD4 appeared on behalf of DPD3, and during that hearing the November 9, 2015, trial was vacated, and a new pretrial hearing was set for the same date.

65.     On November 9, 2015, DPD5 first appeared and indicated she had been assigned as attorney of record for Mr. Frazier.  The matter was continued, again, this time to January 27, 2016.

66.     On January 12, 2016, with the consent of DPD5, the matter was again vacated, advanced and put over to March 1, 2016, for a trial readiness conference.

67.     On February 7, 2016, DPD5 filed a motion on behalf of Mr. Frazier to continue the trial readiness conference.  Attached to the motion was a one-page letter written by Mr. Frazier.  Although not under penalty of perjury, it simultaneously represented both the assertion of his right to a speedy trial which had been repeatedly delayed, and an express, albeit reluctant, waiver of that right, **conditioned on DPD5 continuing to be his attorney**, so that DPD5 could get prepared for trial.  This letter is a one page a description of the Hobson's choice Mr. Frazier was facing, the choice that he made, and is much more than the "enough is enough" comment made by George Vasquez, discussed in his and the *DeCasas* cases. As Judge Gasdia noted, Frazier, also, had **both** the right to a speedy trial **and** the right to competent, prepared counsel. His letter proves that one gave way to the other.

68.     Judge Gasdia granted DPD5's motion and reset the trial readiness conference for June 15, 2016.  On February 23, 2016, for unknown reasons, the matter was advanced, vacated, and put over a week to June 22, 2016.

69.     On June 22, 2016, the Court set the matter for a two-week jury trial on April 3, 2017, with a trial readiness conference on November 2, 2016, and a trial

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

readiness conference date of February 22, 2017. DPD5 presciently noted, "[Mr. Frazier] may raise objections due to many changes of counsel and delays of trial."

70. At the November 2, 2016, trial readiness conference, as Mr. Frazier feared in his letter attached to the February 7, 2016, motion submitted by DPD5, DPD5 advised the court that she was being transferred out of the SVP Unit and, therefore, off of Mr. Frazier's case. DPD5 requested the matter be set for December 9, 2016. The April 3, 2017, trial date and February 11, 2017, trial readiness date, however, remained.

71. On December 2, 2016, however, the minute order reflects that on November 30, 2016, DPD6, who was newly-appointed as deputy public defender to Mr. Frazier's case, called the deputy district attorney assigned to the matter, and reached a stipulation to put over the December 9, 2016, date to February 22, 2017. The stipulation indicated that the reason for the new date was "newly-appointed public defender" and that the April 3, 2017, trial date was "subject to change."

72. DPD6 filed a letter, dated February 7, 2017, with the court confirming an agreement with the district attorney vacating the February 22, 2017, trial readiness date and the April 3, 2017, trial date and setting the next appearance date for April 13, 2017.

73. On February 17, 2017, Mr. Frazier filed a written *Marsden* motion, requesting that Los Angeles County Public Defender's Office be removed as his attorney.

74. On April 13, 2017, Judge Gasdia set a further readiness conference, and set a hearing on Mr. Frazier's *Marsden* motion for April 25, 2017.

75. On April 25, 2017, DPD7 appeared on behalf of DPD6. He indicated on the record that he had spoken with DPD6, and the Public Defender's Office was declaring a conflict in its representation of Mr. Frazier. Although a conflict had long existed, the present Administrator Defendants decided to declare a conflict in Mr.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Frazier's case in April of 2017 in order to avoid the on-the-record evaluation of their representation which would have occurred had the Marsden motion been heard. Their decision to declare a conflict to avoid the PD's Office having to defend their misconduct regarding the retaliatory transfer of DPD5 and the related prejudice to Mr. Frazier was done to conceal their misconduct.

76.     Ultimately, after the conflict declaration, the court appointed conflict counsel, Dale Atherton, Esq.

77.     Defendant Michael Suzuki, currently a Division Chief within the Public Defender's Office and previously the head of the SVP unit from 2009 through 2011, testified in the underlying *Litmon/Vasquez* proceedings that in 2013, when he was head deputy in the Long Beach branch, he was consulted on staffing reassignments and decreases in the SVP unit that later took place in 2014.  He testified that he was asked for his opinion as to whether the SVP unit could absorb a decrease in staff based on two things: the decrease in the filing of new petitions and the progress made on existing petitions. Defendant Suzuki testified that during the recession, the Public Defender's Office had experienced both a hiring and promotional freeze and that all divisions, especially the felony trial division, were significantly understaffed. He stated that it was his opinion, based on his experience as a previous head deputy of the SVP unit, that the unit could absorb the staffing cuts so that attorneys could be sent to the felony trial division.

78.     In the *Rodrigo DeCasas* matter, one of the deputy public defenders, David Santiago (hereafter "Santiago") testified in Mr. DeCasas' underlying *Litmon/Vasquez* proceedings that there were two staffing cuts in 2014: in June and September. Over the span of the cuts, Santiago's case load jumped from 8 cases to 14. Even after Santiago received the redistributed cases due to the 2014 staffing cuts, and until the time Santiago left the unit in 2017, he had absorbed three more cases.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

79.     Another of the deputy public defenders that testified in the *DeCasas* matter, Craig Osaki, (hereafter, "Osaki") testified in the underlying Litmon/Vasquez proceedings that in 2014, during his tenure as Deputy-In-Charge of the SVP unit, approximately fifty percent of the SVP unit's staff was cut, prompting Osaki to notify upper management that he felt the cuts would be harmful to the SVP clients, in part because of the volume and complexity of the SVP cases.

80.     On April 8, 2014, Osaki drafted a memorandum to the Assistant Public Defender, Division Chief, and the Head Deputy of the SVP unit regarding the decision to reduce SVP staffing. Osaki wrote: "At this time, the SVP unit has approximately 170 cases in total. The proposal to reduce the Branch to 10 lawyers would result in approximately a 100% increase in caseloads and the difficult task of reassigning roughly 85 indeterminate cases.  On average, an individual case may have five banker's boxes worth of materials. If eight to nine cases are on average reassigned, the new lawyer will have to process 40 to 50 boxes worth of material. Based on my experience in handling SVP cases, I believe the workload that is expected to be taken on by the 10 lawyers to be concerning.  The lawyer will obviously be less efficient in handling their cases but most importantly the competency of their practice may be challenged. In other words, no lawyer can be competent with such an added workload in such a short period of time."

81.     In his memorandum, Osaki went on to describe to his superiors the complexities of the SVP practice and how SVP cases differ from criminal cases:

"First, unlike a criminal case, we do not decrease our caseloads upon completing a trial (unless we win). In SVP, we have a continuing obligation to represent the client even after we lose at trial. After we lose a trial, in a year the burden shifts to the client to prove by a preponderance of the evidence that he is no longer an SVP.  Second, unlike a criminal case where one is litigating an incident(s) fixed in time, in SVP, the lawyer

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

must stay abreast of the ever-changing nature of the law, the science of diagnosis and the science of risk assessment. In addition, since the focus of the inquiry in SVP cases is whether the individual client is currently an SVP, the lawyer must constantly reassess their cases in light of new science, age, additional treatment, release plans, etc.  Third, the lawyer must be adept in not only criminal law issues, but also be adept in SVP law, some juvenile law, some administrative law and the Code of Civil Procedure.  Finally, the SVP practice has changed dramatically since 2010. The number of scientific journal articles has increased dramatically in recent years. These journal articles cause lawyers to reassess their cases. Recent case law affecting the practice has also caused attorneys to reassess their cases. Most importantly, when our Branch expanded to twenty lawyers, the vast majority of our cases were 2- year cases. Now the vast majority of our cases are indeterminate and obviously more likely to draw appellate review."

Osaki concluded his memorandum with three proposals to reduce staffing more gradually.

82.    At the same time, the attorneys in the SVP unit had expressed to Osaki feeling overwhelmed by the effects of the staffing cuts. Osaki testified that after he drafted his April 8, 2014, memorandum to upper management, the unit held a staff meeting at which Osaki informed the SVP attorneys of his memorandum and that it had gone unanswered by upper management of the Public Defender's Office. Osaki recalled that the staff attorneys then conducted an impromptu meeting themselves to consider drafting a letter to the SVP management, and they instructed Osaki and the unit's head deputy not to attend "because they wanted this letter to be from them and not us."  The letter drafted by the attorneys of the SVP unit and sent to Defendant Public Defender Ronald L. Brown on April 24, 2014, addressed the staff reduction in

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  the unit.  The letter reiterated the same complexities of SVP law and analogized SVP

2  law to capital litigation, stating: "The measure of our productivity cannot be judged

3  by looking at the numbers of filings and trials. Akin to capital litigation, we win when

4  we avoid trial." The attorneys asked that the Public Defender reconsider his decision

5  to reduce the staff of the unit.  Osaki did not see the April 24, 2014, attorneys' letter

6  until after it was drafted and sent to the Public Defender, Defendant Ronald Brown.

7        83.    Santiago also testified that he was one of at least 10 other deputy public

8  defenders who drafted the April 24, 2014, letter to the Public Defender, Defendant

9  Ronald Brown, which was hand-delivered to defendant Brown's office by a fellow

10  deputy. That deputy received a voicemail from defendant Ronald Brown, which was

11  played on speakerphone for other deputies to hear, in which he acknowledged receipt

12  of the letter and that he was going forward with the staffing cuts, but he would

13  perhaps readdress the second round of cuts that fall.  He did not.

14        84.    Defendant Suzuki testified that it was his understanding that in 2014, the

15  unit had 20 attorneys and 120 pending cases, and that the staffing decrease to 15 or

16  10 attorneys still would allow the unit to adequately represent those 120 clients.  Mr.

17  Suzuki was present during informal discussions with other division chiefs, including

18  the SVP unit supervisor, where Osaki's concerns following the staffing cuts were

19  addressed, which resulted in another reassessment of the SVP case load.  As a result

20  of that assessment following the staffing cuts, the office concluded "that the workload

21  was reasonable."  It was not.  The SVP caseload was overwhelming the SVP unit

22  attorneys and cases such as Mr. Frazier case continued to linger without meaningful

23  attention and with no hope of being brought trial within a reasonable time.

24        85.    Santiago testified that in 2014, it was a well-known fact in the

25  courthouse that staffing cuts were ongoing and that "the Public Defenders were

26  delaying their cases, trying to keep up."  Santiago was present at various

27  conversations with Judge Elaine Mandel, Judge James Bianco, and the Public

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  Defender's Office, where the office informed the court of the problems with caseloads

2  and staffing, and that the understaffing was creating great delays in the processing of

3  the SVP cases.

4       86.    On August 21, 2014, Osaki drafted a second memorandum to the

5  Division Chief and the Head Deputy assessing the impact of the first SVP staff

6  reduction.  In a section of that memorandum, Osaki offered an example to upper

7  management where an attorney's case load increasing from nine cases to ten cases

8  disproportionately increases the attorney's workload in order to exemplify for upper

9  management that trial statistics alone were insufficient to determine whether their

10  clients were effectively being represented.  In the August 2014 memorandum, Osaki

11  wrote that the staffing cuts had placed the SVP branch in an untenable situation of

12  being ineffective and that further cuts could lead to civil liability.  He noted that he

13  feared that these cuts had purposefully implicated the SVP clients' federal

14  constitutional right to counsel.

15       87.    After the first round of staffing cuts and in anticipation of the second

16  round, the attorneys of the SVP unit wrote a letter, dated September 4, 2014, to the

17  Los Angeles County Board of Supervisors to express their concern about the

18  "improvident management decisions made by Mr. Brown and his close advisors."

19  The SVP attorneys noted that they were writing to the Board of Supervisors because

20  their concerns to Ronald Brown and the executive management had fallen on deaf

21  ears to the detriment of their clients and the County.

22       88.    On September 24, 2014, the attorneys also wrote to the State Bar of

23  California with a complaint against both the Public Defender and the Assistant Public

24  Defender for "jeopardizing the representation of [their] clients in the Public

25  Defender's Office and placing the lawyers in the untenable position of either being

26  IAC [ineffective assistance of counsel] or effectively abandoning their clients."

27

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

89.     After Osaki's two memoranda were forwarded to upper management in April and August of 2014, staffing cuts continued in the SVP unit.  Santiago testified that he felt he had no choice but to "go straight to the top" with the unit's concerns with the staff cuts.

90.     Santiago testified during both Mr. DeCasas' underlying *Litmon/Vasquez* proceedings and Mr. Frazier's Litmon/Vasquez proceedings that he was also involved in drafting letters to the Board of Supervisors and to the State Bar of California.

91.     Santiago also testified that he was concerned for his position in the PD's office because he had been retaliated against in the past for speaking out against the staff cuts.  Osaki and DPD5 also testified that they were retaliated against for speaking out against the staffing cuts.

92.     DPD5 testified in the underlying *Litmon/Vasquez* proceedings that the receipt of additional cases due to the staff cuts interfered with her ability to prepare Mr. Frazier's case for trial, as well as her other clients, and also that it had an effect on the other attorneys in the SVP Unit and their ability to adequately represent their clients.

93.     In February 2015, Santiago attended a live question-and-answer session with Defendant Ronald Brown.  A microphone was passed around for direct questions and anonymous questions were drawn from a hat due to the atmosphere of fear, Santiago testified.  A number of senior management members of the Public Defender's Office, including Kelly Emling, Laura Green, Michael Suzuki, Jenny Brown, Daniel Kuperberg and Ruben Marquez were also present.  Santiago stood up and asked Defendant Ronald Brown about how the staffing cuts were affecting his clients. Santiago described Defendant Ronald Brown's response as defensive and flippant: "He joked that our caseloads were doubled from one to two which was patently false. He disagreed with my assessment of the fiscal impact of his decision to make cuts. He described our caseloads as artificially low which also seemed to

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  indicate that he had no idea what he was talking about. And I think he started to grow
2  frustrated and angry because that was the last question that he answered that day."

3  94.  On April 25, 2017, one year and five months after DPD5 was assigned to
4  Mr. Frazier's case, DPD6 declared a conflict of interest.  The court relieved DPD6 as
5  counsel and appointed counsel from the Los Angeles County Bar Association's panel
6  of Indigent Criminal Defense Appointments as counsel for Mr. Frazier.  Newly
7  appointed counsel (hereafter "Appointed Counsel") stated on the record that he
8  accepted the appointment and that he may wish to have experts appointed.

9  95.  Mr. Frazier, who had appeared at the hearing telephonically, withdrew
10  his *Marsden* motion as moot.

11  96.  After a number of court appearances, the matter was moving towards an
12  anticipated trial date of June 5, 2018 and the Court was advised by Appointed
13  Counsel that a motion to dismiss (a *Litmon* motion) will be filed.

14  97.  Appointed Counsel filed the Litmon motion on behalf of Mr. Frazier on
15  November 9, 2018.  The January 22, 2019, trial date was to remain.

16  98.  Thereafter, the January trial date was vacated on January 9, 2019, and
17  hearing dates for the Litmon motion were set for March 15, 19 and 20, 2019, and the
18  trial was put over to July 22, 2019. Mr. Frazier expressly stated that he was waiving
19  any further speedy trial issues from that point forward so that his *Litmon* motion
20  could be heard first before the trial.

21  99.  The District Attorney's written Response to the Litmon motion was filed
22  on March 4, 2019.  Also, on March 4, 2019, the March dates for the Litmon motion
23  were vacated, and reset for May 29, 2019, May 30, 2019 and May 31, 2019.

24  100.  The hearing on Mr. Frazier's *Litmon* motion commenced on May 29,
25  2019, and continued through September 18, 2020.

26  101.  In sum, from the filing of the Petition in 2002 through Appointed
27  Counsel's announcement of his intention to file a Motion to Dismiss in 2018, Mr.

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Frazier never once personally waived his right to a speedy trial, other than a contingent waiver of time to allow DPD5 to prepare his matter for trial.  That contingency was not met when DPD5 was ultimately, and against her objections and wishes, transferred from the SVP Unit and Mr. Frazier's case in 2017.  After the first round of staffing cuts within the SVP unit, Mr. Frazier's case was set for trial only two times and both times were continued as a result of transfers of his public defender attorneys.

### E.

### Special allegations regarding the Board of Supervisor Defendants.

102.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl (hereafter "BOS Defendants") are sued herein as members of the Los Angeles County Board of Supervisors and as administrators, managers and supervisors of the Los Angeles County Public Defender's Office.  At all times relevant hereto, and beginning on or about March 2014, these defendants individually received letters and memoranda from Craig Osaki, an attorney from the SVP Unit of the PD's Office, and at least three letters from groups of attorneys from the SVP Unit which informed each of these defendants of the SVP Unit's inability to competently process and manage the SVP cases in the unit, including Mr. Frazier's case.  These letters and memoranda were addressed separately to each of the BOS Defendants and were hand-delivered to their offices.  These memoranda and letters also informed these defendants that the inability to competently manage the SVP cases was causing

103.   The Los Angeles County Public Defender's Office is a Department of Los Angeles County.  *See, List of Los Angeles County Departments* https://www.lacounty.gov/government/departments-commissions-related-agencies/county-departments-and-principal-administration/.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

104.    The Public Defender is appointed by the Los Angeles County Board of Supervisors and reports directly to the Board of Supervisors.  *See*, *Los Angeles County Charter, Article IV, Section 14.*

105.    The Board of Supervisors fulfills the executive, legislative and quasi-judicial powers in Los Angeles County government.  In its executive capacity, the supervisors are required to administer and supervise all government services, including the activities of the Public Defender's Office and its administrators.  *See, Id.*, *Responsibilities of the Board of Supervisors at*:
http://file.lacounty.gov/SDSInter/lac/1031549_BoardResponsibilities.pdf.

106.    At all times relevant hereto, the BOS Defendants were members of the Los Angeles County Board of Supervisors with direct oversight and supervisory duties over Law Offices of the Los Angeles County Public Defender.

107.    The BOS Defendants were regularly made aware of the great delays in the processing of the SVP cases, including Mr. Frazier case.  This notification came by way of the regular meetings that they had with the administrators of the PD's Office and its SVP unit.

108.    Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez also individually met monthly, and often times more regularly, with defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl to discuss and carry out the operation and management of the PD's Office.  These meetings included discussions the PD's office's SVP Unit, its case load, individual cases handled by said unit - including Mr. Frazier's case, the backlog of work in the SVP unit, the understaffing of that unit, and the extended time periods that SVP Unit clients were being detained as the awaited trial.  Defendant Ronald Brown regularly provided defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl with memoranda, emails, reports, minutes of expanded meetings, case summaries, case management statistics and other written correspondence and documents regarding the management and operation of the SVP Unit.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

109.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl oversaw, monitored and/or managed defendant The Law Offices of the Los Angeles County Public Defender.  In carrying out their oversight of said office, they had the authority to order or otherwise compel defendant The Office of the Public Defender and defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to "declare unavailability" in specific SVP cases.  The PD's office often declared "unavailability" in non-SVP cases with the consent of Hilda Solis.

110.   These regular meetings included discussions of the SVP Unit, its case load, individual cases handled by said unit - including Mr. Frazier's case, the backlog of work in the unit, the understaffing of that unit, and the extended time periods that SVP Unit clients were being detained.  The BOS defendants individually requested and received regular memoranda, emails, reports, budget requests, and other written correspondence and documents from defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez and other members of the Public Defender's Office regarding the management and operation of the SVP Unit, including the status of the civil detention proceedings of Mr. Frazier. The BOS defendants had specific knowledge regarding Plaintiff's civil detention proceedings and, as spelled out herein below, was deliberately indifferent to the violation of Mr. Frazier's civil rights.   As such, the BOS defendants were aware of the present plaintiff's SVP case, the long delay in getting his case to trial, and the unconstitutional customs and practices which caused the delays in getting Plaintiff's case to trial and the violation of his civil rights.

111.   The BOS Defendants also each received written letters, memoranda, emails and other correspondence from the administrators of the Public Defender's office and from the attorneys in the SVP Unit informing them:

a.     of the great delays in the processing of the SVP cases, including the great delay in the processing of Mr. Frazier's case;

b.     of the violation of the speeding trial rights and due process rights of the SVP clients, including Mr. Frazier;

c.     that Mr. Frazier was being ineffectively represented and that, as a result, the SVP attorneys were at risk of being sanctioned by the state bar; and,

d.      that continued violation of the Mr. Frazier's constitutional rights to counsel and due process were creating great civil liability for the County of Los Angeles and the BOS defendants.

112.    Despite actual notice of the ongoing and persistent violation of the civil rights of the SVP clients, the BOS Defendants took no meaningful steps, measures or actions during their tenure as members of the Los Angeles County Board of Supervisors to address these constitutional violations, including the ongoing violations of Mr. Frazier's constitutional rights.

113.    Each of the BOS defendants, as a supervisor with direct authority over The Law Offices of the Los Angeles County Public Defender, had the authority to order Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to take specific actions regarding the management of Mr. Frazier's case.

114.    Although they had the authority to do the following so as to prevent the violation of Mr. Frazier's civil rights, BOS Defendants failed to do the following during the 18 years of Mr. Frazier's detention:

a.     Order that the Public Defender attorneys prepare his case, request a trial, and proceed promptly to trial;

b.     Order that his case be given priority for trial over those of other SVP detainees who had been waiting for trial for significantly shorter time periods,

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

c.   Order that his case be transferred to appointed counsel for handling and trial;

d.   Order that a conflict be declared so as to have the case transferred to conflict counsel to proceed with Mr. Frazier's case;

e.   Adhere to the State Bar guidelines for the provision of indigent legal defense services, specifically failing to monitor the caseloads of the Public Defender attorneys that were representing Mr. Frazier; and,

f.   Implement internal measures in the SVP Unit to ensure that Mr. Frazier get to trial promptly.

**F.**

**Special Allegations Regarding Notice of Constitutional Violations to Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez and BOS Defendants**

115.   In early 2014, despite having a monumental backlog of SVP cases, despite the SVP unit's inability to bring many cases to trial on an annual basis, despite the SVP unit's attorneys having an insurmountable workload, and despite having the majority of their SVP cases having an average age of seven to ten years, defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez decided to cut the size of the SVP unit by 50 percent.  They knew that by doing so the delays in getting the SVP cases to trial would be exacerbated.   Once they presented their proposal to the SVP attorneys at various meetings in March and April of 2014, the SVP attorneys strongly voiced their opposition and emphasized to said defendants that their workload would become so oppressive that they would not be able to competently represent their SVP clients, that their SVP clients' constitutional rights would be violated, that they would

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  become subject to claims of ineffective assistance of counsel and that they would be

2  at risk of being disciplined by the state bar.

3        116.    The SVP attorneys wrote memoranda and letters to defendants Ronald

4  Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel

5  Kuperberg, and Ruben Marquez during March, April and August of 2014 and in Auto

6  memorialize the above concerns officially.  Said defendants read the letters and

7  memoranda, acknowledged the concerns, but refused to take the concerns into

8  account and went ahead with the staff reductions.

9        117.    Despite their fear for retaliation, the SVP attorneys wrote to their

10 supervisors and candidly expressed their concerns and gave concrete examples of the

11 impact that the staff reductions would have on their already overburdened ability to

12 represent their SVP clients.  For example, the supervising attorney for the SVP unit

13 wrote the following to these defendants in his letter of April 8, 2014:

14        "At this time, the SVP unit has approximately 170 cases in total. The

15        proposal to reduce the Branch to 10 lawyers would result in approximately

16        a 100% increase in caseloads and the difficult task of reassigning roughly

17        85 indeterminate cases.  On average, an individual case may have five

18        banker boxes work of materials.  If 8-9 cases are on average reassigned,

19        the new lawyer will have to process 40-50 boxes worth of material.  Based

20        on my experience in handling SVP cases, I believe the workload that is

21        expected to be taken on by the 10 lawyers to be concerning.  The lawyer

22        will  obviously  be  less  efficient  in  handling  their  cases  but  most

23        importantly the competency of their practice may be challenged.  In other

24        words, no lawyer can be competent with such an added workload I such a

25        short period of time."

26        118.    The letter was accompanied by a proposal to reduce staffing more

27 gradually so as to permit the SVP attorneys to competently handle the volume of

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

cases.  The concerns and the proposal were ignored and rejected by Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez.

119.   In a subsequent letter, the supervising attorney of the SVP unit wrote in an August 21, 2014, memorandum that staffing cuts "have placed the SVP branch in an untenable situation of being ineffective and further cuts could lead to liability," purposefully implicating the federal constitutional rights to counsel.

120.   In September of 2014 and in June of 2015, the SVP attorneys wrote similar letters and memoranda to the BOS defendants.  The letters and memoranda were sent anonymously for fear of retaliation. The letters and memoranda were hand-delivered to the respective offices of each BOS defendant.  Each of the BOS defendants read these letters and memoranda and discussed them with Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez.  The concerns expressed in the letters and memoranda were acknowledged by Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez and the concerns and concrete examples of the likely results of the staff cuts were ignored and rejected by the BOS defendants without meaningful inquiry or investigation. The staff cuts were agreed to by the BOS defendants and Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez.

121.   Once the staff reductions were implemented, Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez met in February of 2015 with the SVP attorneys to evaluate the impact of the staff reductions.  These defendants were directly informed by the staff attorneys of the great backlog of cases, the burden of the overwhelming work related to the cases, and of the staff's inability to bring cases to trial.  They were told that the

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

staff was essentially just continuing cases in an effort to catch up.  One staff attorney asked Ronald Brown if he had any idea how serious the impact of the staff reductions was.  Ronald Brown mocked the question and joked that the caseloads were artificially low.

122.   As for Mr. Frazier, after the staff cuts were implemented there were 21 continuances of his case between 2015 and 2018.  Neither before nor after the staff cuts did Mr. Frazier ever once waive his right to a speedy trial.

123.   The staff attorneys also wrote to the state bar and accused Ronald Brown of repeatedly violating rule 3-110(A) of the Rules of Professional Conduct by failing to ensure that the lawyers have appropriate resources so that they would be able to competently represent their clients.  This rule provided that "a member shall not intentionally, recklessly, or repeatedly fail to perform legal services with competence."

## G.

### Special Allegations Regarding Concealment of Conflict of Interest

124.   On April 25, 2017, one year and five months after DPD5 was assigned to Mr. Frazier's case, DPD6 declared a conflict of interest.

125.   By that point, however, the conflict of interest had existed for at least 7 years and it was deliberately concealed from Mr. Frazier.

126.   The conflict of interest was created by the great delay in bringing his case to trial.  Due to this great delay, Mr. Frazier was entitled to raise the delay, and resulting denial of his due process and speedy trial rights through a motion under *People v. Litmon* (2004) 123 Cal. App. 4, 1156 (*Litmon I*) and *People v Litmon*, (2008) 162 Cal. App. 4th 383 (*Litmon II*).  Under *Litmon*, Mr. Frazier motion could have been brought successfully by 2010 – he had been in custody then for eight years.

127.   The PD's Office could not raise the *Litmon* issue on Mr. Frazier's behalf, however, because the lawyers and administrators from that office were the

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   cause of the delay.  As such, by 2017 when the PD's Office finally declared a conflict

2   of interest, that office had been in a factual, ethical and constitutional conflict of

3   interest for at least 15 years.

4       128.   Instead, during the majority of the time that the PD's Office represented

5   Mr. Frazier, the administrators from the PD's Office, defendants Ronald Brown,

6   Kelly Emling, Michael Suzuki, Jenny Brown, Laura Green, Daniel Kuperberg and

7   Ruben Marquez, deliberately concealed from Mr. Frazier that he had the right to raise

8   the *Litmon* issue against them.

9       129.   As early as 2014, each one of these defendants discussed this conflict of

10  interest with Mark Ridley-Thomas, with Hilda Solis and with Sheila Khuel separately

11  and informed them that a failure to declare the conflict of interest would result in civil

12  liability.  All of these defendants agreed amongst themselves that they would not

13  raise the *Litmon* conflict of interest with the clients or with the court and that they

14  would not "declare unavailability" with the court so as to avoid being replaced as

15  attorney for Mr. Frazier.   By doing so, they agreed that they would be able to conceal

16  the conflict of interest and avoid civil liability.   This included an agreement amongst

17  themselves that they would strenuously fight any effort to remove the PD's Office as

18  counsel for their SVP clients through *Marsden* motions.

19      130.   As agreed, for example, they fought *Marsden* motions in *People v.*

20  *Darryell Frazier* and in *People v. Corey Williams*.  In the Williams matter, even

21  when urged by the court to file a *Litmon* motion, counsel for Mr. Williams – Ellen

22  Coleman – indicated she was "constrained."

23      131.   In Mr. Frazier's case, by declaring a conflict when it did, the Public

24  Defender's Office deprived the court of the opportunity to rule on Mr. Frazier's

25  *Marsden* motion, to hear Mr. Frazier's complaints regarding the Public Defender's

26  Office and to have the record reflect the court's evaluation of the constitutionally

27  deficient representation of Mr. Frazier.

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

132.   The defendants' plan was foiled and frustrated in April of 2015 when SVP clients Gaspar Zavala convinced the trial court in his cases to dismiss the PD's Office as his counsel and to appoint private counsel to represent him.  New counsel was appointed, and a *Litmon* motion was promptly filed which resulted in the dismissal of Mr. Zavala's case under *Litmon*.  Likewise, on December 22, 2016, another SVP client from the PD's Office, George Vasquez, was granted *Marsden* relief.  Shortly thereafter, a Litmon motion was filed for Mr. Vasquez and his case was also dismissed.  Defendant County of Los Angeles, however, appealed the dismissal of the *Vasquez* case.  The Court of Appeal of the State of California affirmed the dismissal and published its landmark case, *People v. Superior Court (Vasquez)*, (2018) 27 Cal. App. 5th 36, which found that the breakdown of the Los Angeles County public defender system was the cause of the denial of Mr. Vasquez's due process and speedy trial rights. *Id* at 74.[3]  As noted above, another SVP client from the PD's Office, Rodrigo DeCasas, filed a *Litmon/Vasquez* motion following the Public Defender's Office declaring a conflict.  His case was also dismissed and was subsequently appealed.  The Court of Appeal of the State of California, however, affirmed the dismissal and published the case, finding that Mr. DeCasas's due process and speedy trial rights were violated because of the breakdown of the Los Angeles County public defender system.

///

///

///

///

///

---

[3] The Court in *DeCasas* echoed the *Vasquez* findings and also found that Mr. DeCasas's due process and speedy trial rights were violated because of the breakdown of the Los Angeles County public defender system. *People v. DeCasas*, 2020 Cal. App. LEXIS 879, 43-44.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

# VI.

## **FIRST CLAIM FOR RELIEF**

**DELIBERATE INDIFFERENCE CAUSING VIOLATION OF CONSTITUTIONAL RIGHTS, AS TO DEFENDANTS RONALD BROWN, JENNY BROWN, KELLY EMLING, LAURA GREEN, MICHAEL SUZUKI, DANIEL KUPERBERG, RUBEN MARQUEZ, MARK RIDLEY-THOMAS, HILDA SOLIS, SHEILA KUEHL AND DOES 1 THROUGH 10**

133.   Plaintiff Darryell Frazier repeats and realleges each and every allegation above as though fully set forth herein.

134.   This action is brought pursuant to 42 U.S.C. §1983 for violation of Mr. Frazier's rights under Sixth Amendment and Fourteenth Amendment of the U.S. Constitution to a speedy trial, to counsel, and to due process and substantive due process.

135.   Defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez, BOS Defendants and DOES 1 through 10 are sued herein as administrators of The Law Offices of the Los Angeles County Public Defender and its SVP Unit.   Defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez did not represent Darryell Frazier as a trial attorney in any of the underlying SVP commitment proceedings, and they did not appear as counsel for Plaintiff in any of the underly SVP proceedings.   As such, liability against these defendants is not based on these defendants acting within the scope of legal representation of Mr. Frazier.

136.   Plaintiff is informed and believes, and thereon alleges, that The Law Offices of the Los Angeles County Public Defender, its SVP Unit, Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Ruben Marquez, the BOS Defendants, and DOES 1 through 10 failed to timely bring Mr. Frazier's case to trial.  By thus abandoning the present plaintiff, said defendants allowed the present plaintiff to be held as a pre-trial detainee for such inordinately long period of time that his due process rights and his rights to a speedy trial were violated.

137.   As a direct result of the deliberate indifference of the present defendants, plaintiff Darryell Frazier spent 18 years waiting for his case to come to trial before his case was dismissed for due process violations, as alleged herein above.

138.   On or before Mr. Frazier's underlying case/petition was dismissed, there existed within the Public Defender's Office and its SVP Unit various customs and practices which caused the delay Mr. Frazier's case being brought to trial and which caused Mr. Frazier to unnecessarily spend years as a pre-trial detainee waiting for his cases to be brought to trial.

139.   These massive delays in the bringing to trial of the SVP cases were the result of several unconstitutional customs and practices which existed within The Public Defender's Office and its SVP Unit and which the present defendants were aware of and which said defendants ratified.  These customs and practices included:

a.   Failing to regularly bring SVP detainees to court for hearings, or to otherwise ensure that SVP detainees were in court or that they would appear by video conference, so as to conceal from SVP detainees their delays in processing their cases in a timely manner;

b.   Failing to communicate to SVP client/detainees the status of their cases, the strategies which were to be employed in defending their case, and the likelihood of success of their efforts;

c.   Failing to obtain consent from SVP client/detainees to continue hearing dates, trials dates as well as other deadlines which were in their control;

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

d. Waiving of SVP client/detainees' appearance at hearings without securing their authority to do so;

e. Agreeing to repeated continuances sought by the prosecution;

f. Ignoring requests from SVP clients/detainees to bring their case to trial promptly;

g. Failing to meet reasonable deadlines in SVP cases;

h. Failing to timely secure experts, to ensure that such experts are properly prepared, and to ensure that such experts complete their work in a timely fashion;

i. Allowing experts' reports to lapse or otherwise go stale;

j. Concealing material facts from SVP clients/detainees;

k. Concealing their misconduct from SVP clients/detainees;

l. Failing to inform their clients of conflicts of interests;

m. Failing to inform the court of conflicts of interest;

n. Failing to bring cases to trial within the stipulated time period with the District Attorney's Office after the passage of Proposition 83;

e. Failing to file oppositions to motions and other petitions by the prosecution;

f. Allowing SVP cases to sit idle for years without meaningful progress;

g. Failing to declare unavailability, such that long-delayed SVP cases could be assigned to outside/independent counsel;

h. Tolerating a conflict of interest, in violation of state bar ethics rules and standards, and failing to declare such conflicts so as to permit their SVP detainees to file *Litmon-Vasquez* motions after the extensive delays in the processing of their cases;

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

i.   After extensive delays on their part, failing to inform SVP detainees of their right to file a motion under *People v. Litmon* and *People v. Vasquez* for the violation of their constitutional rights;

j.   Refusing to declare an actual conflict upon learning of it;

k.   Failing to object to the use of hearsay evidence by the prosecution's experts;

l.   Waiving probable cause at the initiation of the SVP proceedings; and, failing to raise viable defenses to the SVP allegations, including, but not limited to whether SVP detainees are subject to deportation;

m.   Concealing conflicts of interest from SVP clients and the court, and failing to declare a conflict of interest to allow appointed/private counsel to bring motions under *People v. Litmon* and *People v. Vasquez*; and,

n.   Failing to adhere to the State Bar guidelines for the provision of indigent legal defense services, specifically failing to monitor the caseloads of the Public Defender attorneys.

140.   Both the trial court in Mr. Frazier's case and the Court of Appeal of the State of California in Mr. Vasquez's and Mr. DeCasas' cases have held that there existed in the PD's Office an institutional systemic breakdown of the Public Defender system in Los Angeles County during the time that Mr. Frazier's case was being handled by the PD's Office and that this system breakdown was the cause of the violation of his constitutional rights.

141.   As presented in detail above, the delays in bringing Mr. Frazier case to trial resulted from the systemic breakdown in the PD's Office which resulted from:

a.   A flaw in the public defender's mechanism for identifying and avoiding conflicts of interest,

b.   A failure to train incoming SVP lawyers,

c.      An understaffed public defender office facing overwhelmingly heavy caseload, and,

d.      Underdeveloped expert pool and a payment system which made it difficult to promptly pay expert fees such that few experts were willing to work for the public defender's office.

142.    Defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg, Ruben Marquez and DOES 1 through 5 were aware of the inordinate and excessive delay that plaintiff and the other SVP detainees were experiencing in the processing of their cases and that Plaintiff's case and the other cases were not being brought to trial in a timely basis. Said defendants were aware of the customs and practices described above that existed at the SVP Unit and which were the causes of the failure to bring these cases to trial in a timely fashion.

143.    Between 2006 and 2018, defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg, Ruben Marquez and DOES 1 through 5 learned of these delays in the processing of SVP cases and of the causes of SVP cases not coming to trial in a timely basis through their regular monitoring of the SVP Unit and the monitoring of the performance of the lawyers in that unit.  Said monitoring by defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg, Ruben Marquez and DOES 1 through 5 consisted of:

a.      Monthly meetings with the supervisors of the SVP Unit,

b.      Annual performance evaluations of the supervisors and staff of the SVP Unit,

c.      Annual review of the status of each individual SVP case, the SVP Unit case load, the SVP Unit projections for staff needs and the expert needs conducted during the preparation of the SVP Unit budget for presentation to the Los Angeles County Board of Supervisors.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

d.  Monitoring of appeals brought on behalf of SVP detainees, including the review of appellate briefs regarding and the review of the outcome of such appeals (see e.g., *Arnold v. Superior Court*, (2014) unpublished opinion involving SVP defendant who was challenging an SVP mental health examination and noting critically that "… defendant was evaluated by the hospital's department in 2007. But as of September 2013, his case had not been tried.")

144.   The BOS Defendants and DOES 6 through 10 were informed of the above-mentioned dramatic trial delays in the SVP cases, including the delays in Plaintiff's case, and of the causes of the delays in the SVP cases coming to trial in a timely basis through their regular management, supervision and administration of the Public Defender's Office and through their monthly meetings with defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez.

145.   The BOS Defendants were responsible for monitoring, supervising and management of the performance of the Public Defender's Office.

146.   The BOS defendants regularly met with defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to discuss the issues surrounding the performance of the Public Defender's Office, its SVP Unit and individual cases, including the present Plaintiff's SVP case.   As early as 2008, Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez regularly discussed the significant delays in the processing of pending SVP cases with the BOS Defendants.  They informed the BOS Defendants of the significant backlog of work in the SVP Unit and of the great delays that were occurring in the bringing of these cases to trial.   As early as 2010, they informed the BOS Defendants of Mr. Frazier,

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  who was awaiting trial in his SVP case and informed the BOS Defendants of the

2  number of years he had been waiting for trial.

3      147.   As alleged above, attorneys from the SVP unit wrote memoranda and

4  letters to the BOS Defendants after having their concerns ignored by their

5  supervisors/administrators of the Public Defender's Office. The letters and

6  memoranda specifically noted that the clients being served by the SVP Unit were

7  suffering the violation of their speedy trial rights and their rights to counsel.

8  Moreover, these letters and memoranda warned the BOS Defendants that these delays

9  were creating civil liability for the County of Los Angeles.

10     148.   The BOS defendants received and read these letters and memoranda.

11  They met and conferred with defendants Ronald Brown, Kelly Emling, Laura Green,

12  Jenny Brown, Michael Suzuki, Daniel Kuperberg, Ruben Marquez and DOES 1

13  through 10 to discuss the contents of the letters and memoranda, but failed to take any

14  action to deal with, address, ameliorate or otherwise meaningfully respond to the

15  concerns raised by the attorneys in the SVP unit.

16     149.   Besides discussing the long delays in bringing the SVP cases to trial

17  with the BOS Defendants, Ronald Brown, Kelly Emling, Laura Green, Jenny Brown,

18  Michael Suzuki, Daniel Kuperberg and Ruben Marquez also regularly wrote emails,

19  memoranda, meeting summaries and other written documents to the BOS defendants

20  discussing the delay in the processing of Plaintiff's case.

21     150.   In the regular meetings, which were often monthly, between Ronald

22  Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel

23  Kuperberg and Ruben Marquez and DOES 1 through 10 from 2008 to 2020, these

24  defendants discussed the SVP Unit's significant backlog of cases which had not

25  reached trial in five years, ten years and, eventually, 20 years.   Annually, and often

26  quarterly, all of these defendants collectively discussed with respect to the SVP trial

27  delays:

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

a.   Whether the delay in bringing these cases to trial violated the due process rights and speedy trial rights of the detainees, including Mr. Frazier,

b.   The costs of bringing each case to trial;

c.   The reasons for the delays in bringing Mr. Frazier's case to trial,

d.   The delays occasioned by the lapsing of the expert reports, including in Mr. Frazier's case,

e.   The repeated requests for continuances by the SVP lawyers and prosecutors,

f.   Evaluating the need in each SVP case for a declaration of "unavailability" so as to ensure that each such case was brought to trial, including making such a declaration in Mr. Frazier's case,

g.   Implementing internal measures in the SVP Unit to ensure that each SVP case, including Mr. Frazier's case, got to trial in a timely fashion, and,

h.   Requesting that the supervising judge of the criminal division assign a specific judicial officer or courtroom for the exclusive handing of SVP cases.

151.   During every year between 2006 and 2018, defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez and/or DOES 1 through 5, were aware that the customs and practices in place in the SVP unit were resulting in a large number of SVP cases, including the present plaintiff's case, not getting to trial in a timely fashion.  On a monthly basis during that time, said defendants learned of continuances of trial dates and other related dates which continued to extend the time in which the SVP cases would come to trial.  Notwithstanding this information, said defendants failed to abolish, revoke, rescind or otherwise put a stop to these customs and practices.  They failed to:

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

a.  Implement internal measures in the SVP Unit to advance or otherwise expedite the bringing of the SVP cases to trial,

b.  Prioritize the oldest SVP cases to ensure they would get to trial in an expedited fashion,

c.  Institute tighter controls over supervisors in the SVP Unit to ensure that they managed their subordinates in a fashion that ensured that the older SVP cases would get to trial promptly,

d.  Impose time limits for the bringing of SVP cases to trial,

e.  Establish and implement a policy, custom or practice whereby the PD's office would declare conflicts or declare "unavailability" in old SVP cases so as to ensure that the courts could appoint private counsel or counsel from the alternate public defender's office to bring SVP cases to trial, and,

f.  Establish a policy and implement, custom or practice whereby the PD's office would declare conflicts of interest or declare "unavailability" in those older SVP cases that were subject to a *Litmon* motion so as to permit the court to appoint private counsel to represent those detainees who had valid grounds to bring such motions.

152.    Despite knowing of the great magnitude of the delays in bringing Plaintiff's case to trial, defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez, the BOS Defendants and DOES 1 through 10 failed to take any reasonable measures to ensure that the constitutional rights of Mr. Frazier were protected.  Such failure constituted deliberate indifference to the due process rights and the speedy trial rights of Mr. Frazier.

153.    The BOS Defendants and DOES 1 through 5 knowingly refused to terminate the acts, customs, practices and misconduct of their subordinates, which

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

they knew was causing and would cause constitutional injury upon the SVP detainees in their charge. Said defendants failed to take reasonable measures to institute internal measures within the SVP Unit to address the long delays in getting SVP cases to trial, they failed to institute new training of their subordinates in the management of SVP cases so as to ensure that SVP cases got to trial in a timely fashion, and they failed to discipline their subordinates for failing to get the SVP cases to trial in a timely fashion.

154.   All of these failures on the part of defendants Ronald Brown, Jenny Brown, Emling, Laura Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10 constituted an acquiescence in, and ratification of, the constitutional deprivations that resulted or constituted a reckless and callous indifference to the rights of SVP detainees, including Mr. Frazier.

155.   Every year between 2008 and 2018, defendants Ronald Brown, Jenny Brown, Emling, Laura Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10, through the aforementioned management of the SVP Unit, were made aware of the extended delays in the SVP cases and of the resulting due process violations that the SVP detainees were suffering.

156.   Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl received separate in-person and written reports from defendants Ronald Brown, Jenny Brown, Emling, Laura Green, Suzuki, Kuperberg, Marquez and DOES 1 through 10 as to the great delays in bringing the SVP cases to trial.  Defendants Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10 were responsible for the institution of internal measures within the SVP Unit to correct this unconstitutional condition but failed to

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

do so. Such failure constituted deliberate indifference to the due process rights and the speedy trial rights of Mr. Frazier.

157.   Defendants Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl  and DOES 1 through 10 knowingly refused to terminate the customs, practices and misconduct of their subordinates, which they knew were causing and would continue to cause constitutional injury upon the SVP detainees, including Mr. Frazier.  Said defendants had the authority to discipline supervisorial staff in the SVP Unit for failing to bring SVP cases to trial on a timely basis.  Said defendants failed to discipline their subordinates in the SVP Unit, and thereby ratified the great delays in the brining of the SVP cases to trial.

158.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl  and DOES 6 through 10 failed to institute internal measures within the PD's Office and within its SVP Unit to address the long delays in getting SVP cases to trial, they failed to order or otherwise institute new training of his subordinates in the management of SVP cases so as to ensure that SVP cases got to trial in a timely fashion, and they failed to discipline, or order the discipling of, their subordinates, including defendants Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, and Marquez, for failing to get the SVP cases to trial in a timely fashion. These failures on the part of defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 6 through 10 constituted an acquiescence in, and ratification of, the constitutional deprivations that resulted or constituted a reckless and callous indifference to the rights of SVP detainees, including Mr. Frazier.

159.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl were particularly indifferent to a tremendous degree in his disregard for the violation of the constitutional rights of the SVP detainees in general and of the violation of the connotational rights of Mr. Frazier specifically.  Defendants Mark Ridley-Thomas,

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Hilda Solis and Sheila Kuehl forbade the Public Defender's Office and its supervisors and administrators, including defendants Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, and Marquez, from "declaring unavailability in Mr. Frazier's case; that is, to declare to the court that the public defender's office is "unavailable" or unable to meet its obligations and duties to Mr. Frazier and thereby have the court assign his case to another public defender agency (such as the Office of the Alternate Public Defender) or to a private panel attorney.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl refused to allow the PD's office to "declare unavailability" in Mr. Frazier's case and in other SVP cases despite knowing the following:

     a.    That the SVP unit was significantly backlogged in the processing of SVP cases and that the majority of the SVP cases were years delayed in getting to trial and would continue to be so backlogged;

     b.    That the SVP Unit attorneys were excessively overworked with extremely heavy caseloads that could not be processed and brought to trial in a meaningful and effective way;

     c.    That the caseload for the SVP Unit was exacerbated by a 50% reduction in staff attorneys and administrative staff such as paralegals and investigators; and,

     d.    That less than 50% of the pending SVP cases would ever get to trial within 10 years.

160.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl knew that this exacerbated backlog of SVP cases would be efficiently and meaningfully processed to trial by having the PD's office "declare unavailability" in the older SVP cases, including Mr. Frazier's case, so that the court could assign such cases to other agencies or panel attorneys for trial or other proceedings such as *Litmon* motions.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

161.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl forbade the declaration of "unavailability" in SVP cases, including Mr. Frazier's, despite knowing that failing to do so would cause years of prolonged unconstitutional detention of SVP detainees such as the present plaintiff.

162.   As a result of the above deliberate acts and omissions of defendants Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10, Plaintiff was damaged and injured as alleged above by being made to endure an 18-year pre-trial detention which the Los Angeles County Superior Court found to have violated Mr. Frazier's civil rights.

163.   The conduct of defendants Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10, as alleged above, was done with deliberate indifference to the constitutional violations endured by the present plaintiff.  As such, punitive damages should be imposed, in an amount sufficient to punish said defendants and to deter future similar conduct by said defendants and others in similar positions.

**VII.**

**SECOND CLAIM FOR RELIEF**

**MUNICIPAL  LIABILITY  FOR  VIOLATION  OF CONSTITUTIONAL RIGHTS AS TO DEFENDANTS COUNTY OF LOS ANGELES AND LAW OFFICES OF THE LOS ANGELES COUNTY PUBLIC DEFENDER**

164.   PLAINTIFF repeats and realleges each and every allegation above as though fully set forth herein.

165.   This action is brought pursuant to 42 U.S.C. §1983 for violation of Plaintiff's rights under the Fourteenth Amendment.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

166.   Plaintiff's due process rights were violated by the 18-year delay in bringing his case to trial as determined by the Los Angeles Superior Court and as affirmed by the Court of Appeal of the State of California as alleged above in the first claim for relief.  As a result of the aforementioned acts and omissions of defendants Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10, plaintiff's Fourteenth Amendment due process rights were violated.

167.   At the time of these constitutional violations by said defendants, defendant County of Los Angeles and defendant Public Defender's Office had in place, and had ratified customs and practices which permitted and encouraged attorneys in the Public Defender's Office to delay bringing SVP cases to trial and which violated the due process right of their SVP clients, including Mr. Frazier.

168.   These practices, customs, policies and procedures included:

a.   Failing to regularly bring SVP detainees to court for hearings, or to otherwise ensure that SVP detainees were in court or that they would appear by video conference, so as to conceal from SVP detainees their delays in processing their cases in a timely manner;

b.   Failing to communicate to SVP client/detainees the status of their cases, the strategies which were to be employed in defending their case, and the likelihood of success of their efforts;

c.   Failing to obtain consent from SVP client/detainees to continue hearing dates, trials dates as well as other deadlines which were in their control;

d.   Waiving of SVP client/detainees' appearance at hearings without securing their authority to do so;

e.   Continuing trial dates and other related dates without client consent and without clients waiving their rights to speedy trials,

f.   Agreeing to repeated continuances sought by the prosecution;

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

g.   Ignoring requests from SVP clients/detainees to bring their case to trial promptly;

h.   Failing to meet reasonable deadlines in SVP cases;

i.   Failing to timely secure experts, to ensure that such experts are properly prepared, and to ensure that such experts complete their work in a timely fashion;

j.   Failing to pay experts on a timely basis so as to avoid having experts refuse to work with the Los Angeles Office of the Public Defender;

k.   Allowing experts' reports to lapse or otherwise go stale;

l.   Concealing material facts from SVP clients/detainees;

m.   Concealing their misconduct from SVP clients/detainees;

n.   Failing to inform their clients of conflicts of interests based on their failure to bring SVP cases to trial in timely and constitutional fashion

o.   Failing to inform clients of their right to bring a motion to dismiss their case under *People v. Litmon (I and II)* and in *People v. Vasquez*.

p.   Failing to inform the court of conflicts of interest;

q.   Failing to bring cases to trial within the stipulated time period with the District Attorney's Office after the passage of Proposition 83;

r.   Failing to file oppositions to motions and other petitions by the prosecution;

s.   Allowing SVP cases to sit idle for years without meaningful progress;

t.   Failing to declare unavailability, such that long-delayed SVP cases could be assigned to outside/independent counsel;

u.   Tolerating a conflict of interest, in violation of state bar ethics rules and standards, and failing to declare such conflicts so as to permit their SVP detainees to file Litmon-Vasquez motions after the extensive delays in the processing of their cases;

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

v.   After extensive delays on their part, failing to inform SVP detainees of their right to file a motion under People v. Litmon and People v. Vasquez for the violation of their constitutional rights;

w.   Refusing to declare an actual conflict upon learning of it;

x.   Failing to object to the use of hearsay evidence by the prosecution's experts;

y.   Waiving probable cause at the initiation of the SVP proceedings; and, failing to raise viable defenses to the SVP allegations, including, but not limited to whether SVP detainees are subject to deportation; and,

z.   Failing to adhere to the State Bar guidelines for the provision of indigent legal defense services, specifically failing to monitor the caseloads of the Public Defender attorneys.

169.   The deliberate indifference to the rights of the SVP clients represented by the PD's Office was manifested in the following cases:

a.   The 63 cases that were the subject of the 2007 memorandum of understanding entered into by the PD's Office, the Superior Court and the District Attorney's Office.

b.   The SVP matter of People v. Gaspar Zavala;

c.   The SVP matter of People v. George Vasquez;

d.   The SVP matter of People v. Rodrigo DeCasas;

e.   The SVP matter of People v. Jason Taylor;

f.   The SVP matter of People v. Corey Williams;

g.   The SVP matter of People v. John Lofton; and,

h.   The SVP matter of People v. Darryell Frazier.

170.   Deliberate indifference to the civil rights of SVP detainees such as Mr. Frazier was evidenced by said defendants' ignoring the long delays in the bringing of SVP cases to trial and the long pre-trial detentions suffered by SVP clients.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

171.   Further deliberate indifference by these defendants was evidenced by the following acts and omissions:

    a.    Failing to implement policies and procedures to advance or otherwise expedite the bringing of the SVP cases to trial,

    b.    Failing to prioritize resources to the oldest SVP cases to ensure they would get to trial in an expedited fashion,

    c.    Failing to discipline deputy public defenders who repeatedly failed to bring old SVP cases to trial,

    d.    Failing to institute tighter controls over supervisors in the SVP Unit to ensure that they managed their subordinates in a fashion that ensured that the older SVP cases would get to trial promptly,

    e.    Failing to impose time limits for the bringing of SVP cases to trial,

    f.    Failing to declare conflicts or to declare "unavailability" in old SVP cases so as to ensure that the courts could appoint private counsel or counsel from the alternate public defender's office to bring SVP cases to trial,

    g.    Failing to declare conflicts or declare "unavailability" in those older SVP cases that were subject to a *Litmon* motion so as to permit the court to appoint private counsel to represent those detainees who had valid grounds to bring such motions, and

    h.    Failing to train attorneys coming into the SVP Unit.

172.   The foregoing acts, omissions, and systemic deficiencies are and were customs, practices, policies and procedures of defendant County of Los Angeles and of defendant Public Defender's Office and by ratifying such, these defendants permitted and encouraged attorneys in the Public Defender's Office to delay in bringing SVP cases to trial in a timely fashion.  This caused, permitted and/or allowed under official sanction the attorneys of the Public Defender's Office to

87

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   believe that the long delays in bringing SVP cases to trial would not be objectively,

2   thoroughly and/or meaningfully investigated and that no negative consequences

3   would befall them, all with the foreseeable result that said attorneys would greatly

4   delay in bringing SVP cases to trial and thereby violate the civil rights of the SVP

5   detainees in their charge.

6        173.   As a direct and proximate result of the aforementioned acts alleged

7   herein, Mr. Frazier was detained for 18 years in violation of his due process rights as

8   alleged in the first claim for relief which caused him serious and permanent injuries

9   and have physically, psychologically, and emotionally impaired him permanently.

10        174.   As a result of the above customs, practices, policies and procedures of

11   defendant County of Los Angeles and of defendant Public Defender's Office, Mr.

12   Frazier was damaged and injured as alleged above by being made to endure a

13   wrongful 18-year pre-trial detention.

14   **VIII.**

15   **PRAYER**

16        Wherefore, plaintiff Darryell Frazier demands the following relief, against all

17   the defendants with respect each of the claims for relief above:

18        a.    Compensatory general and special damages in an amount in accordance

19   with proof;

20        b.    Punitive and exemplary damages, against defendants Ronald Brown,

21   Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, Ruben

22   Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through

23   10 in an amount sufficient to deter and to make an example of these defendants;

24        c.    Reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C.

25   §1988;

26        d.    Costs of suit necessarily incurred herein; and,

27        e.    Such further relief as the Court deems just or proper.

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1

2   Dated: December 28, 2020            CASILLAS & ASSOCIATES

3                                       By:  /s/  Arnoldo Casillas
4                                       ARNOLDO CASILLAS
                                        DANIEL W. GILLETTE
5                                       Attorneys for Plaintiff
                                        DARRYELL FRAZIER
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1

## **DEMAND FOR JURY TRIAL**

2          COMES NOW Plaintiff DARRYELL FRAZIER and respectfully demands that

3    the present matter be set for a jury trial.

4

5

6    Dated: December 28, 2020              CASILLAS & ASSOCIATES

7                                          By:  _/s/  Arnoldo Casillas_

8                                          ARNOLDO CASILLAS
                                           DANIEL W. GILLETTE
9                                          Attorneys for Plaintiff
10                                         DARRYELL FRAZIER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

# EXHIBIT 1

Memorandum of Understanding Documenting Agreed Upon Changes to the October 11, 2006 Stipulation To Implementation of "Jessica's Law" or Legislation

The following memorializes the agreement reached concerning changes to the October 11, 2006 Stipulation to Implementation of "Jessica's Law" or Legislation:

1. In direct response to the ballot initiative known as "Jessica's Law" and the related urgency legislation, on October 11, 2006, representatives from the Los Angeles County Public Defender, the Los Angeles County District Attorney and the Los Angeles Superior Court entered into a written stipulation regarding the applicable length of commitment for individuals represented by the Los Angeles County Public Defender for whom Sexually Violent Predator (SVP) petitions were pending at the effective date of the initiative or legislation.  For those individuals, it was agreed that the District Attorney would seek a two year rather than an indeterminate commitment.  The stipulation was signed by the Supervising Judge of the Los Angeles Superior Court Criminal Division and the Public Defender and District Attorney Head Deputies.

2. The October 11, 2006 stipulation contained a 24 month limit by which time the pending SVP petitions would need to be tried in order to benefit from the two year commitment term provided by the stipulation. This limitation is contained in the paragraph entitled "24 Month Time Limit".

3. Following the October 11, 2006 stipulation, the Public Defender's Office determined that it lacked the necessary resources to try all its pending SVP cases during the required 24 months provided for in order for the affected individuals to benefit from the two year commitment term.  This would necessitate the Public Defender choosing which clients would go to trial before the time limit was reached and which would not, presenting ethical and liability issues. Because of this, the Public Defender sought to be relieved on 64 cases.

4. After several months of effort, the Superior Court determined that it could not find an adequate number of private attorneys willing and qualified to assume representation of the SVP clients that the Public Defender was unable to handle.  Because of this lack of available and competent private attorneys, an executive manager in the District Attorney's Office offered to withdraw the 24 month time limit in exchange for the Public Defender's maintaining representation of the 64 clients.  This would ensure that these SVP clients would have competent representation and that they would not be deprived of due process because of a lack of County, attorney and judicial resources.

5. Accordingly, in May, 2007, executive managers from the District Attorney and Public Defender agreed to rescind the section entitled "24 Month Time Limit" of the October 11, 2006 Stipulation to Implementing Jessica's Law or Legislation in exchange for the Public Defender's Office continuing representation of every one of its SVP clients.  The County agreed to provide the Public Defender's Office with additional resources to enable it to handle the increased workload.  Representatives of the Los Angeles Superior Court were present at the time of the agreement eliminating the 24 month time limit and were in acquiescence.  All other sections of the October 11, 2006 stipulation remained the same.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1

6.  In reliance on the May, 2007 agreement to delete the 24 month time limit, the Los
2   Angeles County Public Defender's Office maintained representation of every one of its
original SVP clients.

3

4   _____          _____
Jane Blissert                      Michael Suzuki
5   Representative--District Attorney  Representative--Public Defender

6

The Court accepts the stipulation.
7

8   _____
Peter Espinoza
9   Judge, Los Angeles Superior Court

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**